EL PUEBLO DE PUERTO RICO, peticionario, *v.* JAIME MARTÍNEZ MARTÍ y OTROS, acusados y recurridos.

*Número:* O-84-205     *Resuelto:* 30 de noviembre de 1984

*Doris Zoé Pons Pagán, Procuradora General Auxiliar,* abogada de El Pueblo, peticionario; *José A. Rubio Pitre,* abogado del recurrido Luis Martínez Martí; *Juan E. Taboas Santiago,* abogado del recurrido Jaime Martínez Martí; *Manlio Arraiza Donate,* abogado de la recurrida Sonia Rivera González.

## SENTENCIA

Examinados los autos del caso, memorandos y demás constancias, se expide el auto y se confirma la resolución del Tribunal Superior, Sala de Arecibo, que declaró con lugar la moción de supresión de evidencia formulada por los acusados recurridos.

Continuarán en instancia los trámites ulteriores.

Así lo pronunció y manda el Tribunal y certifica la señora Secretaria General. El Juez Asociado Señor Irizarry Yunqué emitió opinión concurrente a la cual se une el Juez Presidente Señor Trías Monge. El Juez Asociado Señor Rebollo López emitió opinión concurrente. El Juez Asociado Señor Torres Rigual disintió sin opinión y el Juez Asociado Señor Negrón García emitió opinión disidente.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Opinión concurrente emitida por el Juez Asociado Señor Irizarry Yunqué a la cual se une el Juez Presidente Señor Trías Monge.

Al someterse el informe final de la Comisión de la Carta

de Derechos de la Convención Constituyente, el 14 de diciembre de 1951, se hicieron, entre otras, las siguientes expresiones:

La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias abusivas de las autoridades. La fórmula propuesta en la sección 8 cubre ambos aspectos. Complementa constitucionalmente lo dispuesto en la sección 10 y cubre el campo conocido en el derecho norteamericano como el *"right of privacy"* particularmente importante en el mundo moderno. 4 Diario de Sesiones de la Convención Constituyente 2566 (1951).

Específicamente, en relación con la Sec. 10, (¹) se señaló: "La lesión de la intimidad es en ese sentido el más penoso ataque a los derechos fundamentales de la persona." 4 Diario de Sesiones, *supra*, pág. 2567. Ese principio fundamental, recogido en nuestra Constitución, rige en la resolución de este caso.

I

Jaime Martínez Martí, Sonia Rivera González y Luis Martínez Martí fueron acusados por infracción del Art. 168

---

(¹) Dice así:

"*Sec. 10. [Registros e incautaciones; intercepción de comunicaciones telefónicas; mandamientos]*

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

"No se interceptará la comunicación telefónica.

"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

"Evidencia obtenida en violación de esta sección será inadmisible en los tribunales." Art. II de la Carta de Derechos, Documentos Históricos, L.P.R.A., ed. 1982, pág. 299.

del Código Penal, 33 L.P.R.A. sec. 4274 (Recibo de bienes apropiados ilegalmente), Art. 401 de la Ley de Sustancias Controladas, 24 L.P.R.A. sec. 2401, y Art. 6 de la Ley de Armas, 25 L.P.R.A. sec. 416. Solicitaron que se suprimiera "la evidencia" que había sido incautada en virtud de una orden de registro y allanamiento. Alegaron que la orden es insuficiente de su faz y que había sido expedida sin que existiera causa probable para ello, ya que la declaración jurada presentada para obtenerla era insuficiente.

El tribunal de instancia declaró con lugar la "moción de supresión de evidencia" y el Ministerio Público acudió en alzada ante este foro mediante una petición de *certiorari* que acompañó de una moción en auxilio de jurisdicción. Ante tal solicitud, paralizamos la celebración del juicio y demás procedimientos en instancia y emitimos una orden para que los acusados mostraran causa por la cual no debe dejarse sin efecto la resolución recurrida. Los acusados han comparecido y reiteran que no medió causa probable para la expedición de la orden de registro y allanamiento.

Lo expuesto en la declaración jurada que dio base a la orden es, en síntesis, lo siguiente: Alguien recibió información anónima en la Policía de Arecibo al efecto de que los "hermanos Luis y Jaime Martínez Martí c/p Los Gorilas residentes en la Calle Coballes Gandía #129 de Hatillo, Puerto Rico están traficando con drogas y tienen armas en sus residencias". El 17 de octubre de 1983 el supervisor del declarante le asignó investigar dicha "querella". Éste se dedicó a vigilar la edificación en la mencionada dirección, que consta de dos plantas, los días 18, 21, 24 y 31 de dicho mes. El 18 a las 12:00 del mediodía, vio que un hombre entró en la planta baja y a los diez minutos salió con una bolsa de papel de estraza; a la 1:30 de la tarde vio llegar a dos individuos en un automóvil que se detuvo y uno de ellos se bajó, subió a la segunda planta y regresó rápidamente al auto; el otro le entregó unos billetes, éste volvió a subir y a los cinco minutos regresó trayendo una bolsa de papel de estraza. Ambos se

marcharon en el auto. En las demás fechas todo lo que vio fue lo siguiente: El 21 vio a un hombre entrar a la casa y salir a los diez minutos; el 24 vio a una mujer entrar a la segunda planta y salir a los diez minutos, y el 31 de octubre vio a un hombre entrar a la planta baja y salir a los diez minutos. Esto es todo.

Durante la audiencia para resolver sobre la "moción de supresión de evidencia" no se practicó prueba. Toda la información que hay en autos sobre la base en que descansa la orden de allanamiento es la que aparece en la declaración jurada del agente. No hay indicio alguno de que el declarante conociera a Luis y Jaime Martínez Martí y por tanto de que las cinco personas que vio entrar y salir de la casa en los cuatro días de su vigilancia no fueran ellos y otros residentes de la misma. Nada indica que el agente conociera a los residentes de dicha casa. Tampoco hay indicio alguno de que el declarante supiera o tuviera información de que esas cinco personas fueran reconocidos traficantes de drogas o personas inmiscuidas en su uso.

De la declaración del agente no se desprende un frecuente entrar y salir de gente a la casa. La vigilancia fue por muchas horas durante los cuatro días que duró, pues se extendió en ocasiones desde por la mañana hasta las 4:00 de la tarde, y solamente entraron y salieron cinco personas durante los cuatro días. De esas cinco personas, sólo dos salieron con bolsas de papel de estraza. Las otras tres que entraron y salieron diez minutos después nada traían. No hay descripción de las bolsas, excepto decir que eran de papel de estraza. Nada se dice de su tamaño, que pueda dar idea de su contenido.

En cuanto a la información anónima recibida, no hay constancia en los autos de por qué medio llegó ni cuándo ni cómo el informante obtuvo la información. Lo único que surge de los autos es que se recibió una querella limitada a que los "hermanos Luis y Jaime Martínez Martí c/p Los Gorilas residentes en la Calle Coballes Gandía #129 de Hatillo,

Puerto Rico están traficando con drogas y tienen armas en sus residencias".

El problema ante nuestra consideración es si de lo expuesto en la declaración jurada podía determinarse la existencia de causa probable para expedir una orden de registro y allanamiento. Al confirmar la resolución del tribunal de instancia, lo hace este Tribunal mediante una lacónica sentencia, pasando por alto la oportunidad de sentar normas de fundamental importancia para dar vigencia a los postulados constitucionales antes aludidos. Me permito hacer aquí unos señalamientos confiado en que un día no lejano puedan brillar en nuestro foro con luz de nuestra jurisprudencia, que hoy no se ha querido encender.

## II

La determinación de causa probable basada en la información obtenida de una tercera persona, es decir, de un informante, plantea un problema particular porque quien firma la declaración jurada no tiene conocimiento personal de los hechos que le llevan a solicitar la orden de allanamiento. El declarante meramente reporta la información que le proveyó un tercero, que no está ante el magistrado para poder ser examinado por éste, y quien no goza de la presunción de confiabilidad que tiene, por ejemplo, un oficial del orden público que expone los hechos que él mismo ha observado.

En la jurisdicción federal la doctrina tradicional surge de los casos de *Aguilar* v. *Texas*, 378 U.S. 108 (1964), y *Spinelli* v. *United States*, 393 U.S. 410 (1969).[2] Bajo dicha doctrina una confidencia puede dar base a la existencia de causa probable para la expedición de una orden de allanamiento y registro si se satisfacen dos requisitos: (1) que se revelen al magistrado hechos que le permitan determinar la

---

[2] Las referencias a casos no resueltos por este Tribunal se hacen para fines comparativos. Esta opinión se funda exclusivamente en la interpretación de la Constitución del Estado Libre Asociado.

credibilidad inherente del informante o, en la alternativa, la confiabilidad de su relato, y (2) que se informen al magistrado hechos que le permitan determinar qué razones tenía el informante para conocer lo que informó.

Usualmente la confiabilidad del informante tiene base en sus colaboraciones anteriores. Véase: 1 *LaFave, Search and Seizure, A Treatise on the Fourth Amendment,* Sec. 3.3, pág. 508 y ss. (1978); Y. Kamisar, *Gates, "Probable Cause", "Good Faith", and Beyond,* 69 Iowa L. Rev. 551, 557 (1984); C. E. Moylan, Jr., *Hearsay and Probable Cause: An Aguilar and Spinelli Primer,* 25 Mercer L. Rev. 741, 758-760 (1974). En otros casos la confiabilidad puede basarse en que la información dada puede constituir una declaración contra el interés del informante, que le coloque en peligro de ser enjuiciado e ir a prisión. Véase *United States* v. *Harris,* 403 U.S. 573 (1971). Esto es sólo un factor; hace falta algo más que el relato contra el interés del informante para que se admita su confiabilidad. Véase LaFave, *op. cit.,* pág. 523 n. 100, y casos allí citados. Esta razón que constituye a su vez una excepción a la regla de prueba de referencia, no puede ser admitida cuando el informante no revela su identidad pues, si el Estado no sabe quién es, el informante no podría estar abocado a un proceso criminal. LaFave, *op. cit.,* pág. 526; Notas, *Collateral Estoppel—Effect of Guilty Pleas in Subsequent Civil Actions;* y *Probable Cause and the First-Time Informer,* 43 U. Colo. L. Rev. 337, 357, 367 (1972); *Highlights of the Term,* 85 Harv. L. Rev. 40, 60 (1971); véanse también *Barber* v. *State,* 406 A.2d 668, 672-673 (Md. Ct. Spec. App. 1979); *State* v. *Mabrey,* 231 S.E.2d 461, 463 (Ga. Ct. App. 1976).

En cuanto a la base para el supuesto conocimiento del informante como factor, el Tribunal Supremo federal expresó en *Aguilar* v. *Texas,* supra, pág. 114, que "el magistrado debe ser informado de algunas de las circunstancias subyacentes bajo las cuales el informante concluyó" que se estaba llevando a cabo una actividad delictiva o que había objetos

delictivos donde él alegaba. El Tribunal delineó en *Spinelli* v. *United States*, supra, dos maneras adicionales de satisfacer el requisito esbozado en *Aguilar* v. *Texas*, supra. La mejor forma es cuando la declaración jurada del agente expresa directamente cómo alega el informante que obtuvo su información. Esto ocurre, por ejemplo, cuando se expresa que el informante tiene conocimiento personal de lo que informa y se detalla ese conocimiento.

Otra manera de establecer la base de conocimiento del informante es si la confidencia contiene suficientes detalles que describan la actividad criminal del acusado. Ese detalle hace que el magistrado se asegure que está "descansando en algo más sustancial que un rumor casual que circula en el bajo mundo o en una acusación basada meramente en la reputación general de un individuo". *Spinelli* v. *United States*, supra, pág. 416; Íd., págs. 425–426 (White, J., Opinión Concurrente). Este llamado método del detalle autoverificable no es preferible, por supuesto, a la declaración explícita del informante de cómo obtuvo su información. Por eso debe usarse con suma cautela, y sólo puede emplearse para autorizar un registro cuando el detalle es tan minucioso y de una naturaleza tal que resulte evidente que el informante tenía una adecuada base de conocimiento, pues sólo una persona con conocimiento directo de aquello que luego denuncia a la Policía podría ofrecer semejante detalle. *United States* v. *Bush*, 647 F.2d 357, 363–364 (3rd Cir. 1981); LaFave, *op. cit.*, pág. 546.

Debe tenerse presente que el factor del detalle autoverificable sólo puede satisfacer el requisito de la base de conocimiento del informante, y no el requisito de la veracidad de éste o la confiabilidad de su relato. LaFave, *op. cit.; Probable Cause, op. cit.*, págs. 360, 362. Tal y como se explicó en *Stanley* v. *State*, 313 A.2d 847, 862 (Md. Ct. Spec. App. 1974):

. . . [T]he "self-verifying detail" technique cannot repair a defect in the "veracity" prong. The notion that great detail implies personal observation rather than the overhearing of

barroom gossip, presupposes an honest informant. If the informant were concocting a story out of the whole cloth, he could fabricate in fine detail as easily as with rough brush strokes. Minute detail tells us nothing about "veracity".

La norma de *Aguilar* y *Spinelli*, supra, cumple una función sumamente importante: asegurar que sean los jueces, y no los policías o los informantes, quienes determinen si existe causa probable para la expedición de una orden. Es por eso que el magistrado debe tener todos los datos necesarios para cumplir con su encomienda. Dicha función judicial no puede ser abdicada, porque "[e]n cuanto a los registros, la causa probable define el punto en que el derecho individual a la intimidad debe ceder al interés del Estado de investigar conducta delictiva mediante un registro con propósitos de buscar y ocupar objetos incriminatorios". *Tendencias recientes en torno a la garantía constitucional contra registros y allanamientos*, Informe del Secretariado de la Conferencia Judicial de este Tribunal, Parte III-A, págs. 25-26 (1984).

La doctrina sentada en *Aguilar* y *Spinelli*, supra, fue abandonada recientemente por el Tribunal Supremo federal en *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983). En su lugar se adoptó el análisis de "la totalidad de las circunstancias", bajo el cual el magistrado que va a expedir una orden de registro sólo tiene que decidir, sobre la base de las circunstancias que se exponen en la declaración jurada ante él, si hay una probabilidad razonable de encontrar contrabando o evidencia de un delito en un lugar particular.

La decisión de *Illinois* v. *Gates*, supra, pág. 233, expresa que los dos elementos de la norma *Aguilar* y *Spinelli*, supra, no deben tener un *status* independiente y que una deficiencia en uno debe poder compensarse con el otro elemento. En su dura crítica a *Gates* y en defensa de la independencia que la norma *Aguilar* y *Spinelli*, supra, establece para ambos de sus componentes, expresa el profesor LaFave:

As is highlighted by these deficiencies in the Court's examples, the *Gates* majority's proposition (ii) contains a fatal flaw.

A "common-sense decision" on probable cause, to take their language, necessitates attention to both veracity and basis of knowledge, and to treat a strong showing of one as curing a deficiency in the other makes a mockery of the Fourth Amendment's probable cause requirement. The preferred method of satisfying the basis of knowledge requirement, a direct statement from the informant himself as to how he came by the information, is virtually worthless when it comes from an individual from the criminal milieu about whom no veracity judgment is possible. And information tendered by a person of unquestioned credibility is worth very little when no judgment is possible as to the basis of his conclusions —whether or not, to use the Court's oft-quoted language, he is merely reporting "an offhand remark at neighborhood bar". This is why, as Justice White quite correctly declared in his separate opinion in *Gates*, the probable cause standard necessitates "some showing of facts from which an inference may be drawn that the informant is credible and that his information was obtained in a reliable way". (Escolio omitido.) LaFave, *op. cit.*, págs. 192–193 (1985 Supl.).

*Illinois* v. *Gates*, supra, prácticamente pone fuera del alcance de la revisión judicial la determinación de causa probable basada en la inquietante e imprecisa norma llamada de "la totalidad de las circunstancias". Constituye un retroceso en la bien fundada doctrina de la primacía y la necesidad de la revisión judicial para evitar el abuso del poder policíaco. Esta doctrina, basada en la exigencia constitucional de que "[s]ólo se expedirán mandamientos autorizando registros, allanamientos o arrestos *por autoridad judicial*" (énfasis suplido), Art. II de la Carta de Derechos, Documentos Históricos, L.P.R.A., ed. 1982, pág. 299, quedó expuesta claramente y sin rodeos en *Pueblo* v. *Albizu*, 77 D.P.R. 896, 902 (1955): "La determinación de causa probable es función que compete a la autoridad judicial. . . . Dicha función no puede delegarse y la opinión, creencia o conclusiones del declarante no juegan papel alguno en dicha determinación." (Citas omitidas.)

Dice, al respecto, el profesor LaFave:

Certainly the potential for highly inconsistent and largely unreviewable probable cause determinations is there. When the majority in *Gates* says that from now on probable cause is to be ascertained by "a totality of the circumstances analysis", one cannot help but recall the pre-*Miranda* experience under the old "totality of the circumstances" voluntariness test for determining the admissibility of confessions. That confession standard proved to be a failure; it "left police without needed guidance" and "impaired the effectiveness and the legitimacy of judicial review". Should that experience now be replicated in the Fourth Amendment area as a result of *Gates*, then Justice Brennan will have proved prophetic in declaring that "today's decision threatens to obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law". (Escolios omitidos.) LaFave, *op. cit.*, pág. 195.

El profesor LaFave no está solo en sus críticas a la decisión de *Illinois* v. *Gates*, supra, en que hubo tres jueces disidentes y uno que concurrió en el resultado con opinión separada. En nuestro ámbito, y ante los jueces de este Tribunal, hace poco tuvimos ocasión de escuchar magníficos comentarios de crítica de parte del profesor Charles Alan Wright, en su ponencia titulada *Some Recent Developments in Criminal Procedure,* en ocasión de la Décima Sesión Plenaria de la Conferencia Judicial de 1983, 52 Rev. Jur. U.P.R. 13 (1984). Para otras críticas, véanse Kamisar, *op. cit.*; Erickson, *Pronouncements of the United States Supreme Court Relating to the Criminal Law Field: 1982–1983,* 12 Colo. Law. 1377 (1983); A. Abramovsky, *Illinois v. Gates: A New Standard for Evaluating Probable Cause Based on Informant's Hearsay,* 10 Search and Seizure L. Rep. 149 (1983).

No puede confundirse la "totalidad de las circunstancias" de *Illinois* v. *Gates*, supra, ya severamente criticada, como vimos, con el principio tantas veces reiterado de que la causa probable se determina a base de criterios de probabilidad y razonabilidad. Véanse: *Pueblo* v. *Bogard,* 100 D.P.R. 565,

570-571 (1972); *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 19, 25-26 (1964); *Pueblo* v. *Rivera*, 79 D.P.R. 742, 747 (1956); *Pueblo* v. *Albizu,* supra, pág. 902; *Pueblo* v. *Capriles,* 58 D.P.R. 548, 558-559 (1941). La "totalidad de las circunstancias" es una norma imprecisa que, a diferencia del criterio *Aguilar* y *Spinelli,* supra, carece de guías para que el magistrado pueda determinar la existencia de causa probable.

A tono con la reconocida norma de que un Estado puede expandir, mas no contraer los derechos garantizados por la Constitución federal —W. J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977)— este Tribunal ha "adoptado criterios constitucionales a la vanguardia de los enunciados en algunos de los dictámenes del Tribunal Supremo de los Estados Unidos". *Pueblo* v. *Dolce*, 105 D.P.R. 422, 428 (1976) y casos allí citados. En este sentido podemos adoptar, y este es el caso para haber adoptado, una norma más exigente que la recientemente enunciada en *Illinois* v. *Gates*, supra.

Es doctrina claramente establecida en esta jurisdicción que la determinación de causa probable tiene que basarse en hechos, no en conclusiones o sospechas, que basten para determinar que se ha cometido o se está cometiendo un delito por el cual la ley autoriza la expedición de una orden de allanamiento. *Pueblo* v. *Bogard,* supra; *Pueblo* v. *Tribunal Superior,* supra; *Pueblo* v. *Rivera,* supra; *Pueblo* v. *Albizu,* supra; *Pueblo* v. *Tribunal de Distrito*, 69 D.P.R. 413, 416 (1948); *Pueblo* v. *Capriles,* supra. Si las conclusiones o creencias de un agente del orden público no bastan para determinar la existencia de causa probable, mucho menos pueden servir las de un informante que no está ante el magistrado y cuya identidad a menudo se mantiene confidencial o ni siquiera es conocida por el declarante. La declaración jurada tiene que contener información que coloque al magistrado en posición de poder determinar si el informante es una fuente confiable y con conocimiento personal de hechos que demues-

tren la existencia de causa probable para la expedición de una orden de registro y allanamiento.([3])

Cuando se trata, como en el caso de autos, de un informante anónimo no puede determinarse su confiabilidad, ni la credibilidad de la información que provee, por los medios que se utilizan cuando se conoce la identidad del informante. Es imposible verificar si ha colaborado en ocasiones anteriores. Tampoco puede saberse si está supliendo información contra su interés, de naturaleza tal que lo coloque en peligro de ser enjuiciado criminalmente. Para establecer la credibilidad de la información prestada por un informante anónimo es necesario que medie la corroboración de tal información por parte de los agentes del orden público. La corroboración no puede ser meramente de detalles inocentes sino de hechos sospechosos que indiquen que se está llevando a cabo la actividad criminal que el informante hubo señalado.

Como bien se expresó en *Spinelli* v. *United States*, supra, pág. 415: "He [the magistrate] must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?". *United States* v. *Schmidt*, 662 F.2d 498 (8th Cir. 1981); *Stikes* v. *State*, 397 So. 2d 178 (Ala. App. 1981), *writ* denegado 397 So. 2d 183 (1981); *Rohrig* v. *State*, 253 S.E.2d 253 (Ga. App. 1979); *Radowick* v. *State*, 244 S.E.2d 346 (Ga. App. 1978); *Rutledge* v. *United States*, 392 A.2d 1062 (D.C. App. 1978); LaFave, *op. cit.*, págs. 557–578; Moylan, *op. cit.*, págs. 777–779; M. A. Rebell, *The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards*, 81 Yale L.J. 703, 715–717 (1972); Comentario, *Anonymous Tips, Corroboration, and Probable Cause: Reconciling the Spinelli/Draper Dichotomy in Illinois v.*

---

([3]) A este respecto, las expresiones contenidas en *Pueblo* v. *Díaz Díaz*, 106 D.P.R. 348 (1977) y *Pueblo* v. *Acevedo Escobar*, 112 D.P.R. 770 (1982), que puedan ser interpretadas como incompatibles con lo aquí expuesto, debieran considerarse revocadas.

*Gates*, 20 Am. Crim. L. Rev. 99, 107 (1982); Nota, *The Informer's Tip as Probable Cause for Search or Arrest*, 54 Cornell L. Rev. 958 (1969).

## III

En el caso ante nuestra consideración no hay un solo ápice de razón para determinar la confiabilidad o credibilidad del informante, y tampoco si éste tenía conocimiento personal de la información que ofreció a la Policía. Se trata, como vimos, de un informante anónimo que se limitó a expresar que los "hermanos Luis y Jaime Martínez Martí c/p Los Gorilas residentes en la Calle Coballes Gandía #129 de Hatillo, Puerto Rico están traficando con drogas y tienen armas en sus residencias". El magistrado no tenía forma alguna de saber si el informante tenía conocimiento personal de los hechos o si se trataba de un mero rumor o conjetura de otra naturaleza. En cuanto a las observaciones del agente, éstas se limitaron a actividades inocentes que de forma alguna permiten escudriñar la confiabilidad del informante ni determinar la existencia de causa probable.

¿Puede catalogarse de sospechoso el hecho de que en un día en particular dos personas entren a una casa y salgan, cada una, con una bolsa de papel en las manos? ¿Cómo puede sospecharse una actividad clandestina cuando estos hechos ocurren a plena luz del día, a la vista de un agente que ni siquiera conoce a los que entran y salen ni si son residentes de la casa? ¿Podríamos decir que entrar y salir de una casa con una bolsa de papel, en la que se lleva dinero no puede implicar otra cosa que una transacción de drogas? Aceptar esa conducta como buena para allanar y registrar una morada es cosa de estados policíacos regidos por la tiranía. No es justificable en un régimen de libertad en que se respeta el sagrado derecho de todo ciudadano a disfrutar de la intimidad de su hogar. Si fuese así, Dios nos guarde de la intromisión de la Policía en la santidad de nuestros hogares.

Las razones expresadas justifican la sentencia que hoy dicta este Tribunal. Es lamentable que no se acojan como la razón de decidir en este caso.

—O—

Opinión disidente emitida por el Juez Asociado Señor Negrón García.

"El Derecho se monta sobre la vida social misma, la fenomenología jurídica se integra por acaeceres arrancados del calendario cotidiano. El legislador quiere ir delante en sus previsiones, pero la fecundidad y heterogeneidad de los hechos les desborda." F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 42.

Nuestra Constitución no erige una barrera infranqueable para la persecución del crimen. Cuando la propiedad privada y la preciada intimidad sirven de instrumentos al delito, "detenerse ante esas fronteras de la personalidad equivaldría a la protección indebida del delito y del delincuente. En esta colisión de lo privado y lo público, la solución se entrega, con todas las garantías a la autoridad judicial encargada de perseguir y sancionar las transgresiones de la ley. Las garantías personales frente al arresto, el registro, la incautación y el allanamiento tienen su límite en la conducta criminal. Sólo para casos de sospecha fundada o sea cuando medie causa probable . . . se concede a la autoridad judicial la facultad de expedir mandamientos de arresto y registro". *Informe de la Comisión de la Carta de Derechos*, 4 Diario de Sesiones de la Convención Constituyente 2567-2568 (1951). La sentencia confirmatoria de este Tribunal frustra esa visión y encomienda de los autores de la Constitución.

I

En buena metodología adjudicativa inicialmente debemos trazar correctamente las coordenadas de este recurso.

Primero, no versa, como sugiere la opinión concurrente, sobre la "determinación de causa probable basada en la información obtenida de una tercera persona, es decir, de un informante". Por ende, no "plantea un problema particular porque quien firma la declaración jurada no tiene conocimiento personal de los hechos que le llevan a solicitar la orden de allanamiento". Tampoco trata sobre un "declarante [que] meramente reporta la información que le proveyó un tercero, que no está ante el magistrado para poder ser examinado por éste, y quien no goza de la presunción de confiabilidad que tiene, por ejemplo, un oficial del orden público que expone los hechos que él mismo ha observado".

En consecuencia, huelga todo análisis en torno a la figura del confidente y los requisitos doctrinales aplicables para la expedición de una orden de allanamiento y registro. Por ser un ejercicio jurídico fútil y académico nos abstendremos de profundizar en ese tema.

Segundo, excluida la doctrina del confidente y sus contornos, la controversia se reduce a determinar la suficiencia de la declaración jurada prestada por el agente de la policía ante un magistrado. Tercero, en esta tarea, enfatizamos que no está en juego la credibilidad de dicho funcionario. Nadie ha cuestionado su veracidad. Tampoco la legitimidad de sus observaciones durante la investigación según plasmada en su declaración jurada. Cuarto, al aquilatar la suficiencia de los hechos, no sólo hemos de presumir la certeza de los mismos, sino dejar sentado que nuestra función estimativa se realiza no en virtud de la norma probatoria de "duda razonable", sino en una fundada causa probable. Y quinto, no deben confundirse ni traerse a colación precedentes judiciales en que se evalúan intervenciones directas de la Policía sin antes acudirse a un magistrado.

## II

El trasfondo fáctico que nutre el recurso es sencillo. Tiene su génesis en una confidencia anónima recibida por la

Policía, en el sentido de que los "hermanos Luis y Jaime Martínez Martí c/p Los Gorilas, residentes en la Calle Coballes Gandía #129 de Hatillo, Puerto Rico están traficando con drogas y tienen armas en sus residencias". Ello movió a que se asignara al agente de la policía José A. Vélez Montano, de la División de Inteligencia Criminal de Arecibo, su investigación. A tal efecto, el 18 de octubre de 1983, éste se trasladó a Hatillo. Durante cuatro (4) días mantuvo una estrecha vigilancia a la citada residencia. A base de sus observaciones directas acudió ante un magistrado y obtuvo una orden de allanamiento. En lo pertinente, su declaración jurada expuso:

Como a eso de las 12:00 M.D. llegó a la residencia antes mencionada un individuo trigueño, de afro, como de 5'7" de estatura, como de 150 libras de peso, el cual vestía pantalón mahón azul, T-shirt azul y tenis, entró a la planta baja de la residencia saliendo como a los 10 minutos con una bolsa de papel estraza en sus manos marchándose del lugar. Ese mismo día a eso de la 1:30 P.M. llegaron a la misma 2 individuos en un auto Toyota 1.8 color azul, modelo 1982-83, la tablilla no visible desde el puesto de observación. Uno de los individuos se bajó del auto y se dirigió a la residencia y subió a la segunda planta regresando rápidamente al auto. El otro individuo le entregó unos billetes y éste volvió a subir a la residencia. Este individuo es blanco, como de 5'7" de estatura, 160 libras de peso aproximado, pelo lacio negro. Volvió a bajar de la residencia como a los 5 minutos con una bolsa de papel estraza en sus manos montándose en el auto marchándose del lugar. A eso de las 3:00 P.M. me retiré del lugar.

El día 21 de octubre de 1983, en horas de la mañana volví a establecer la vigilancia a la residencia antes mencionada. A eso de las 12:10 P.M. llegó a la misma un individuo a pie, el cual es blanco, como de 5'5" de estatura, como de 130 libras de peso, pelo lacio castaño, el cual vestía pantalón verde, camisa crema y entró a la residencia antes mencionada saliendo como a los 10 minutos de la residencia. A eso de las 4:00 P.M. me retiré del lugar. El día 24 de octubre de 1983 volví a establecer la vigilancia en horas de la tarde. A eso de las 3:00 P.M. llegó a la misma una mujer como de 5 pies de estatura, 100

libras de peso, pelo negro ondulado, la cual vestía pantalón negro, blusa negra, y sandalias. Subió a la segunda planta saliendo como a los diez minutos marchándose del lugar. El día 31 de octubre de 1983, en horas de la mañana volví a establecer la vigilancia. A eso de las 9:00 A.M. llegó a la misma un individuo negro, como de 5′6″ de estatura, como de 140 libras de peso, el cual vestía pantalón rojo, camisa crema, y entró a la planta baja de la residencia saliendo como a los 10 minutos retirándose del lugar.

Las probabilidades de que se estuviera violando la ley según lo apreció el agente y evaluó el magistrado fueron correctas. La orden rindió frutos criminosos. Al ser diligenciada se ocuparon cuatro (4) bolsas plásticas conteniendo picadura de marihuana, diez (10) cigarrillos de marihuana, un (1) revólver cargado, $1,558.50 en efectivo y propiedad mueble hurtada.

Como resultado, Jaime y Luis, de apellidos Martínez Martí, y Sonia Rivera González, fueron acusados de infringir el Art. 401 de la Ley de Sustancias Controladas, el Art. 6 de la Ley de Armas y el Art. 168 del Código Penal (recibo de bienes apropiados ilegalmente).

Sin embargo, ante el Tribunal Superior, Sala de Arecibo, solicitaron exitosamente la supresión de la evidencia a base de que la declaración jurada para obtener la orden de allanamiento era insuficiente y los hechos observados por el agente "totalmente inocentes".

A solicitud del Procurador General, mediante trámite de mostrar causa, revisamos.

## III

Bajo la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, los hechos que directamente observó, y en su oportunidad presentó el agente Vélez Montano al magistrado, fueron suficientes y justificativos de la orden de allanamiento. Satisfacen plenamente el requisito constitucional de "causa probable".

El concepto "causa probable" es uno de amorfos linderos. No es ni puede ser de carácter estático. No puede aprisionarse a determinado tiempo o espacio. Resiste todo intento de definición absoluta y apriorística. A tal efecto nuestra jurisprudencia ha reconocido que el "criterio o medida para juzgar si existe causa probable no puede expresarse en términos rígidos y absolutos: la cuestión estriba en determinar si los hechos y las inferencias que se derivan de los mismos, a juicio de una persona prudente y razonable, bastan para creer que se está cometiendo o se ha cometido el delito por el cual la ley autoriza la expedición de una orden de allanamiento". *Pueblo* v. *Rivera*, 79 D.P.R. 742, 746-747 (1956). En dicho caso refrendamos además el siguiente lenguaje: "Cuando nos referimos a causa probable . . . actuamos a base de probabilidades. Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho." (Cita tomada de *Brinegar* v. *United States*, 338 U.S. 160, 175 (1949).) Íd., pág. 747.

En *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 19, 25 (1964), citando otros tribunales dijimos: "Al determinar que es causa probable no estamos llamados a establecer si la ofensa que se imputa fue verdaderamente cometida. Nos concierne sólo la cuestión de si el deponente tuvo base razonable, al momento de prestar su declaración jurada y haberse librado la orden de registro, para creer que se estaba violando la ley en el lugar a ser allanado; y si los hechos aparentes que se desprenden de la declaración jurada son de tal naturaleza que una persona prudente y razonable pudiera creer que se ha cometido la ofensa imputada, hay la causa probable que justifica la expedición de una orden." (Cita tomada de *Dumbra* v. *United States*, 268 U.S. 435, 441 (1925).

Y en *Pueblo* v. *Bogard*, 100 D.P.R. 565, 570-571 (1972), indicamos "que en casos sobre allanamientos y registros no

se requiere una interpretación técnica y restringida de la declaración del agente".

No obstante esa clara trayectoria jurisprudencial, una vez más el mandato constitucional ha sido mal interpretado. Se imponen exigencias férreas. Se ha olvidado que la subordinación de la autoridad policial al Poder Judicial se creó para la protección de los derechos del ciudadano en evitación de arbitrariedades de la Policía. Aún así, la intervención del magistrado en esa etapa no es para determinar más allá de duda razonable la culpabilidad de una persona. Sucede que a menudo se confunden los conceptos y se anulan órdenes válidas bajo esa premisa inarticulada. Es un error. La función judicial se circunscribe a si existe o no causa probable. Para arribar a esa conclusión, "[b]asta con que el magistrado pueda razonablemente creer que es probable que se está violando la ley. Por eso es que lo que va a determinar el magistrado se llama causa *probable; no es causa segura*". (Énfasis nuestro y escolio omitido.) *Pueblo* v. *Tribunal Superior*, supra, pág. 38. Causa probable no es sinónimo de certeza matemática. Por *probable*, "[d]ícese de aquello que hay buenas razones para creer que se verificará o sucederá". *Diccionario de la Lengua Española*, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, pág. 1067. En resumen, la causa probable contemplada por la Constitución es una de sentido común fundada en la totalidad de las circunstancias. Su naturaleza es esencialmente pragmática. No es teórica ni abstracta.

Bajo esta premisa, pecaríamos de ingenuos al catalogar de inocentes las percepciones del policía Vélez Montano. En su ánimo prevenido —como debe ser toda labor investigativa policial— ciertamente las actividades que observó, a la luz de su experiencia e inferencias razonables, eran lo suficientemente sospechosas como para acudir ante un magistrado a solicitar una determinación de causa probable. Para el funcionario judicial existía la necesaria prueba, directa y circunstancial, para expedirla. Nos explicamos.

Es profusa la literatura basada en estudios empíricos sobre el fenómeno de la marihuana en sus múltiples facetas. *Pueblo* v. *Ortiz Pepín*, 105 D.P.R. 547, 554 (1977). Tomamos conocimiento judicial de que en transacciones ilícitas existe un patrón de conducta típico, análogo en cierto modo, al de una actividad comercial legal. Se entiende. Después de todo, en el fondo se trata de una compraventa. Intervienen unas personas que consienten. Además se desembolsa dinero en efectivo. Pero la analogía no se detiene ahí. Si la mercancía es bastante (media libra o más), de ordinario se entrega en una envoltura en particular. El método predilecto de empaque es la bolsa de papel de estraza. (1) La explicación es sencilla. Dichas bolsas son las más económicas y accesibles. Comúnmente son usadas por los comercios y colmados del país en general. De ese modo astuto, rutinariamente se logra encubrir el delito. Además, ello le imprime el sello de legitimidad a lo que no es una actividad inocente.

Teniendo en mente y aplicando al caso de autos esta realidad, advertimos que la utilización de bolsas de estraza, el intercambio de dinero en efectivo y el movimiento extraño de los visitantes —según narrados por el agente Vélez Montano— sugerían y podían evaluarse de dos maneras: "inocentes" o por el contrario altamente sospechosos, susceptibles de encajar, en lo indispensable, en ese perfil criminoso. En este sentido estamos ante un caso fronterizo capaz de una u otra apreciación.

Respetamos los criterios que apoyan la primera. Sin embargo, nos inclinamos —al igual que el agente y el juez instructor— a mirar la actividad suspicazmente criminosa. No debe extrañar a nadie. Según el jurista Soto Nieto, en "la psicología del Juez, paradógicamente, se trenzan y entretejen la pasionidad y la iniciativa, la confianza y la suspicacia . . .",

---

(1) El *papel de estraza* se define como "muy basto, áspero, sin cola y sin blanquear". *Diccionario de la Lengua Española*, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, pág. 972.

*op. cit.*, pág. 42. Bajo esta óptica, ¿por qué negarle validez constitucional al ejercicio de la facultad discrecional del juez instructor que encontró causa probable al estimarla sospechosa? ¿Por qué como juez instructor en lo penal, maniatar su discernimiento, imaginación e intelecto a la tesis de actos inocentes? ¿Puede tacharse de irrazonable esa determinación judicial? ¿Es justa? "Podemos afirmar que nada que no sea razonable puede ser justo; y que nada será justo si no es razonable." (Escolio omitido.) J. E. Leonetti, *El llamado "mundo jurídico" y la realidad*, Rev. Jur. Argentina La Ley 363, 364 (1984-A).

Varios indicadores y elementos racionales y razonables han movido nuestra consciencia judicial. Al exponerlos es oportuno recordar que "[s]iempre es difícil saber lo que es justo, pero siempre se puede intentar ser sincero". Michael Ashe, de la novela *Gina*, citado por Soto Nieto, *op. cit.*, pág. 22.

La actividad se desarrolló en una residencia. No existía negocio u otro establecimiento comercial que justificara la inusitada entrada y salida de personas en aparente tráfico mercantil. Desde el primer día, el agente Vélez Montano se percató del comportamiento suspicaz de unas personas que realizaban unas transacciones con dinero. Como resultado se entregaba la "mercancía" en bolsas de estraza. Esos movimientos de entrada y salida e intercambio duraban escasos minutos. "Cada delito tiene unas características externas, una manera de realizarse, que lo proyectan visualmente, tipifican la circunstancia delictiva y dirigen el raciocinio hacia la concreción de motivos" para causa probable. *Pueblo ex rel. E.P.P.*, 108 D.P.R. 99, 101 (1978). Los actos descritos en la declaración jurada, unidos a las inferencias susceptibles de hacerse, corresponden a uno de los múltiples *modus operandi* conocidos por los policías en que se desenvuelve el tráfico ilícito de sustancias controladas, y los usos y costumbres de los infractores. La Policía no viene obligada a cerrar los ojos para dejar de ver lo que es visible. *Pueblo* v. *Bogard*,

supra, pág. 572. Tampoco a olvidar y dejar de aplicar la experiencia acumulada o a desarrollar una miopía intelectual.

Por ello no alcanzamos a comprender la lógica que reclama como inocentes —por vía de interrogantes— el que allí el agente Vélez Montano sospechara una actividad clandestina bajo la hipótesis de que los hechos ocurrieron a plena luz del día en una residencia. ¿Desde cuándo la conducta delictiva acontece sólo durante horas de la noche? El delito, en particular el asociado al vicio de fumar marihuana y demás sustancias controladas, no tiene un horario regular y definitivo. Más aún, ¿desde cuándo es necesario que un agente conozca previamente a unas personas para maliciarse la probable comisión de delito en una residencia? "La dinámica de la conducta delictiva, aunque diferente en sus protagonistas, medios y en un sinnúmero de circunstancias, presenta en el fondo características básicas comunes. Lo importante es detectar cuándo esas discrepancias, producto de las diferencias humanas, están presentes en determinada actuación." *Pueblo* v. *Espinet Pagán*, 112 D.P.R. 531, 537 (1982).

## IV

Para ultimar, opinamos que en este caso, frente a la malicia, taimería e inventiva delictiva en el tráfico de drogas, imponemos injustificadamente a la Policía serias restricciones a su imaginación y capacidad de acción. Nuestra sentencia, si constituye derecho, es torcido. Es ajeno a las realidades de la sociedad en que opera. No cumple las necesidades del Puerto Rico de hoy, *Pueblo* v. *Batista Montañez*, 113 D.P.R. 307 (1982). Cabe recordar la siguiente admonición: "El Derecho no se produce y realiza en abstracto, desligado de los estímulos que la vida y la diaria experiencia le acarrean. Son las acciones de los hombres, sus cuitas y sus esperanzas, las que ocupan las previsiones del legislador. Asesorar a aquéllos, prescribirles normas de conducta, de-

finir sus derechos en liza, y utilizar para ello fórmulas que puedan parecerles esotéricas o abstractas, resulta tan ilógico como la conducta de aquellos médicos a que se refiere Ossorio, que seguían hablando y recetando en latín cuando ya nadie entendía este idioma." Soto Nieto, *op. cit.*, pág. 254.

—O—

Voto concurrente separado emitido por el Juez Asociado Señor Rebollo López.

He sentido la obligación de exponer mi criterio personal respecto a la controversia aquí planteada al encontrarme en la situación de no poder suscribir ni la opinión concurrente emitida por el Juez Asociado Señor Irizarry Yunqué ni la opinión disidente suscrita por el Juez Asociado Señor Negrón García, no obstante lo bien razonadas y fundamentadas que están ambas ponencias.

I

La Cuarta Enmienda de la Constitución de Estados Unidos de América y la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico protegen, en lo pertinente, el derecho del pueblo americano y puertorriqueño contra registros y allanamientos irrazonables, disponiendo que no podrán expedirse mandamientos judiciales autorizando dichos registros y allanamientos a menos que exista *causa probable*, apoyada la misma en juramento o afirmación.

Se puede afirmar, sin temor a equivocarse, que dichas disposiciones constitucionales han sido objeto, tanto en el foro federal como el local de posiblemente las más numerosas y extensas interpretaciones por parte de los tribunales de justicia, siendo, a su vez, dichas decisiones judiciales objeto de las más variadas críticas y análisis por parte de los estudiosos del derecho.

Es un hecho incuestionable que los tribunales de justicia,

en su función de pautar el derecho, por necesidad se ven en la obligación de establecer reglas o normas generales. Ello, como sabemos, no sólo es necesario sino sumamente beneficioso y conveniente para la profesión, pues ésta necesita saber a qué atenerse.

Hay campos del derecho, sin embargo, que se resisten a ello. Ese es el caso de la materia que ocupa nuestra atención en el día de hoy. En relación con los casos de registros y allanamientos la dificultad ha consistido, y estriba, en que una vez establecidas y pautadas las reglas o normas generales, (1) las excepciones a las mismas que por necesidad han tenido que posteriormente establecerse han llevado al resultado curioso de convertir la supuesta regla general en una excepción más.

La razón de lo anteriormente expresado es, a nuestro entender, sorprendentemente sencilla: esta materia, como muchas otras, realmente no es susceptible de ser gobernada por reglas o normas inflexibles y férreas. Un análisis objetivo de las innumerables decisiones judiciales emitidas a través de los años por los diferentes foros apelativos en esta clase de casos demuestra que en realidad cada caso fue resuelto de acuerdo a los hechos específicos del mismo y que la decisión última a que se llegó en dichos casos dependió o fue el producto de la opinión que sobre el elusivo y sumamente difícil de definir concepto de "causa probable" tenían los miembros de determinado tribunal apelativo en determinado momento. Entendemos que es hora ya de que reconozcamos que esa, en realidad, es la verdadera regla general respecto a esta materia.

Dentro del amplio campo reglamentado por las disposiciones constitucionales antes mencionadas, tenemos el tema específico que ocupa nuestra atención en el caso presente: una orden de registro y allanamiento expedida a base del testimonio de un agente de la policía, basado dicho testimo-

---

(1) Las cuales, hay que reconocer, han servido su propósito.

nio en una confidencia que fuera brindada por un informante y en las observaciones propias que con motivo de la misma hiciera dicho agente al intentar corroborar la información ofrecida.

Como era de esperarse, en relación con dicha materia se ha intentado establecer a través de los años distintas reglas generales para "regular" la misma.(2) El Tribunal Supremo de Estados Unidos en su más reciente decisión al respecto y en su "último" intento por establecer una norma general apropiada, en *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983), estableció el criterio (*test*) de la "totalidad de las circunstancias".

Según la referida norma la determinación que sobre la legalidad y razonabilidad de la orden de allanamiento expedida hará, en revisión judicial, el tribunal apelativo dependerá de si de la declaración jurada prestada ante el magistrado que expidió la misma había, en vista de la totalidad de las circunstancias presentes, base sustancial para que este funcionario llegara a la conclusión —producto la misma del sentido común— de que existía *la probabilidad* de que el registro produjera evidencia delictiva.

Genuina y honestamente entendemos que el referido criterio (*test*) ni es una "inquietante e imprecisa norma" ni constituye "un retroceso en la bien fundada doctrina de la primacía y la necesidad de la revisión judicial para evitar el abuso del poder policiaco", como piensa, y expresa en su opinión concurrente, el querido compañero, Hon. Carlos Juan Irizarry Yunqué.

A nuestro humilde entender, y a riesgo de ser repetitivo, lo que se ha hecho es ponerle una "etiqueta distinta", que suena diferente, a lo mismo que se ha venido haciendo: determinar la legalidad o ilegalidad de la orden de allanamiento expedida a base de los *hechos específicos* de cada caso en particular.

---

(2) Hecho que no debe sorprender a nadie.

## II

Lo que si posiblemente impresiona e impacta de la decisión emitida en el caso de *Illinois* v. *Gates,* ante, es que dicha decisión es un eslabón más en la reciente tendencia o "viraje" de parte del Tribunal Supremo de Estados Unidos hacia lo que podríamos catalogar de una interpretación más "restrictiva" de los "derechos" de los ciudadanos de ese país "garantizados" bajo la Cuarta Enmienda; "derechos amplios" que precisamente ese Alto Foro Judicial había incorporado, por vía de interpretación, al ordenamiento jurídico de la nación americana mediante decisiones emitidas en los últimos treinta años. [3]

Las razones para dicho "viraje" pueden ser varias y, naturalmente, nadie puede precisarlas con exactitud. Ejerciendo la facultad y el derecho que nos concede el hecho de ser miembros de la raza humana —con derecho a pensar y a opinar— entendemos que la causa más probable de esa reciente tendencia del Supremo Federal lo es que dicho foro está "reaccionando" al clamor del pueblo americano respecto a la ola de criminalidad que está azotando al mundo en que vivimos. [4]

Naturalmente no se han hecho esperar las severas críticas de esas recientes decisiones del Supremo Federal por varios sectores y organizaciones de la comunidad americana. No obstante ello, merece seria consideración el argumento de que, a pesar de que es cierto que hay derechos básicos garantizados por la Constitución de un país democrático como el nuestro que no son ni pueden ser afectados por el pasar de los años, no debemos olvidarnos del hecho de que esa Constitución fue creada precisamente para beneficio y

---

[3] Expresamos que la decisión impresiona e impacta sencillamente porque en nuestra opinión el caso de *Illinois* v. *Gates,* 462 U.S. 213 (1983), hubiera sido resuelto en forma distinta hace algunos años.

[4] Encuesta tras encuesta demuestra que en Estados Unidos, al igual que en Puerto Rico, la criminalidad constituye la mayor preocupación de los ciudadanos.

en protección del bien común; que la visión e interpretación que de su constitución haga el tribunal supremo de un país en un momento determinado de su historia muchas veces no puede ser la misma que la que ese tribunal haya hecho veinte años antes como tampoco posiblemente sea igual a la que se hará veinte años más tarde; y que el bien común debe y tiene que estar por encima del bien o derecho de un individuo en particular.

En el pasado hemos expresado que los miembros de un tribunal apelativo no pueden darse el lujo de encerrarse en un edificio sin ventanas —con total y absoluta abstracción de lo que está sucediendo a su alrededor— con el único propósito de elaborar normas de derecho y emitir decisiones sin tomar en consideración las realidades y mejores intereses de los ciudadanos de nuestro país y el efecto adverso que las mismas puedan tener.[5]

No hay duda de que la criminalidad que actualmente azota a nuestro pueblo ha causado que nuestra ciudadanía viva los momentos más difíciles en su historia. Igualmente cierto lo es el hecho de que una de las causas principales, si no la principal, de ese grave problema lo es el despreciable tráfico ilegal de drogas narcóticas. Estamos conscientes de ello. Ese hecho, sin embargo, no puede llevar a este Tribunal a destruir de un plumazo el derecho y la protección que le concede nuestra Constitución a esa misma ciudadanía contra registros y allanamientos ilegales e irrazonables de sus hogares.

En otras palabras, aun cuando tenemos la obligación de atender el clamor de nuestro pueblo para que se erradique el crimen y se encierre al criminal tras las rejas de una prisión, no podemos, en irresponsable cumplimiento de ese clamor, poner en riesgo y promover la violación indiscriminada de la santidad de los hogares en Puerto Rico. Todos los extremos son igualmente indeseables. Tenemos que hacer

---

[5] Opinión disidente en *Romero Barceló* v. *Hernández Agosto*, 115 D.P.R. 368, 393–394 (1984).

un esfuerzo por armonizar ambas posiciones y preocupaciones. Habrá quien lo llame hacer "derecho torcido"; nosotros, por nuestra parte, lo calificamos de hacer justicia.

## III

Con ello en mente, examinemos los hechos específicos del caso ante nuestra consideración:

No podemos convalidar la declaración jurada que sirvió de base a la orden de allanamiento aquí en controversia, como pretende el querido compañero Negrón García, meramente porque la misma "rindió frutos criminosos". Si ello así fuera, extremadamente fácil y sencillo sería resolver esta clase de situaciones. Aun cuando es correcto que "causa probable" no significa "causa segura" ni es sinónimo de "certeza matemática", no es menos cierto que tampoco significa "causa posible".

La referida declaración, en nuestra opinión, es clara y palpablemente insuficiente. Veamos:

A — En primer lugar, *y en cuanto al aspecto de la supuesta confidencia recibida,* siendo la misma anónima no hay ni puede haber prueba de que el alegado confidente fuera uno "confiable".[6] Por otro lado, ni el agente que presta la vigilancia ni ningún otro miembro de la fuerza policiaca realiza esfuerzo alguno para ni tan siquiera constatar si las personas mencionadas en la referida confidencia efectivamente residían en la casa mencionada, gestión básica a realizarse en esta clase de situaciones por todo cuerpo policiaco que aspire a ser conocido por su excelencia profesional.

B — En segundo lugar, *ya en relación con las propias observaciones del agente producto de la vigilancia que prestara,* la única información que provee dicho agente del orden

---

[6] En el sentido de que en el pasado hubiera ofrecido otras confidencias que hubieran resultado ciertas. *Pueblo* v. *Díaz Díaz,* 106 D.P.R. 348 (1977). (A. S. Negrón García, J.)

público es que en un período de trece (13) días[7] él observa a unas seis (6) personas —las cuales no conoce por nombre, ni tiene idea alguna de quiénes puedan ser o a qué se puedan dedicar— que han entrado a la residencia en controversia, abandonando dos de ellos la misma con "bolsas de estraza" en las manos. ¿Puede esa observación calificarse, como lo hace el compañero Negrón García, de "inusitada entrada y salida de personas" de una residencia? Tampoco se realiza gestión alguna, por parte de la Policía de Puerto Rico, durante ese período de trece días para "conocer" *la identidad* y, sobre todo, *la reputación* de dichos visitantes; labor obviamente no difícil dado el tamaño del pueblo de Hatillo, Puerto Rico, pero sumamente importante, pertinente y mandatoria en esta clase de situaciones. ¿Acaso no hace diferencia que los visitantes hubieran sido conocidos drogadictos o ex convictos, o, por el contrario, personas respetables de la comunidad?

A base de lo expuesto en la declaración jurada que prestó el agente de la policía —y sin que éste hubiera realizado gestión ulterior alguna sobre lo por él observado— ¿qué *probabilidad* existía de que en la casa en controversia hubiera material delictivo? La contestación es sumamente sencilla: la misma que hubiera habido en la casa de cualquier otro ciudadano. Bajo esas circunstancias, somos del criterio que la declaración jurada que dio base a la orden de allanamiento aquí en controversia es palpablemente insuficiente tanto bajo los casos de *Aguilar* v. *Texas*, 378 U.S. 108 (1964), y *Spinelli* v. *United States*, 393 U.S. 410 (1969), como bajo el caso de *Illinois* v. *Gates*, ante, o como bajo cualquier nueva "etiqueta judicial" que en un futuro un tribunal apelativo tenga a bien acuñar.

En resumen, aun cuando estamos conscientes de la alta incidencia criminal de que es víctima nuestro país y no obstante haber rendido "frutos criminosos" la orden de alla-

---

[7] Del 18 al 31 de octubre de 1983.

namiento expedida, nos vemos en la obligación legal de resolver que la referida orden no puede prevalecer. Resolver lo contrario sería poner en riesgo de ser allanado el hogar de *cualquier* ciudadano en Puerto Rico y, en su consecuencia, constituiría un incumplimiento de nuestra función como custodios máximos de nuestra Constitución y del bienestar general de la comunidad.

Procede en su consecuencia la confirmación de la resolución emitida en el presente caso por el tribunal de instancia.