EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* JULIO MUÑOZ SANTIAGO, CARMEN GONZÁLEZ NAZARIO, OSCAR COLÓN MALDONADO, ELIODORO OCASIO TORRES Y AMILCE VÉLEZ RAMOS, demandados y recurridos.

*Números:* CE-88-623 *Resueltos:* 6 de noviembre de 1992
CE-88-756
CE-89-780

966

*Rafael Ortiz Carrión, Procurador General,* abogado de El Pueblo de Puerto Rico; *Pablo Colón Santiago,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI emitió la opinión del Tribunal.

Los recursos consolidados que tenemos ante nos requieren que determinemos la norma que se ha de seguir en los casos en que hay una orden judicial de registro o allanamiento basada en una declaración jurada que incluye confidencias parcialmente, a la luz de lo requerido por la Constitución federal.

## I

En el primer caso, la residencia de los recurridos Julio Muñoz Santiago y Carmen González Nazario, ubicada en el sector Balcanes del Barrio Ollas del Municipio de Santa Isabel, Puerto Rico, fue objeto de un allanamiento por parte de varios agentes del orden público el 8 de diciembre de 1987. Como resultado de dicho allanamiento, se ocupó material relacionado con el juego ilegal popularmente conocido como "bolita".

La orden de allanamiento, que autorizó la intervención de los agentes en la referida residencia, fue expedida el 4 de diciembre de 1987 por el Tribunal de Distrito de Ponce, fundada en la declaración jurada del agente Ortiz Correa, adscrito a la División de Control del Vicio del área de Ponce. En su declaración Ortiz Correa señaló que otro policía, el agente Orlando Ortiz, le había comunicado una información confidencial que éste había recibido, que involucraba a un tal Yuyo y su residencia con el manejo y cuadre de una banca de bolita.

Según la aludida información, el conocido por Yuyo recogía material de bolita en Santa Isabel y Juana Díaz los martes en horas de la mañana y luego, en horas de la tarde, lo llevaba a su residencia. Ahí se dedicaba a cotejar y cuadrar dicho material en unión a su hijo de nombre Julito. El material de bolita permanecía en esa residencia hasta no más tarde de las 7:00 P.M. del martes, cuando Yuyo salía con el material para entregarlo a otro bolitero. Yuyo tenía un auto gris y había sido intervenido anteriormente por infracción a la Ley de Bolita.

La confidencia aludida llevó al agente Ortiz Correa a realizar una investigación, que a su vez sirvió de base para la declaración jurada prestada por él. En dicha declaración jurada, el agente Ortiz Correa relató lo siguiente:

Comencé esta investigación el día 24 de noviembre de 1987, en horas de la tarde y me ubiqué cerca de la residencia a eso de las

2:45 P.M., salió de la residencia un individuo de guayabera de manga corta, el cual abordó un auto color azul, tablilla 33 S 869, el cual me pasó por el lado y se dirigió al Bo. Las Ollas y le dí seguimiento a distancia y observé que se estacionó frente al negocio c/p Riveras Places, donde penetró y salió rápidamente que de ahí se movió para detenerse en el negocio, color azul sin nombre, donde entró y luego de varios minutos salió y pasó al negocio, color amarillo con cortinas rosa, donde se estacionó y tocó bocina y del interior salió un individuo blanco, de pelo negro, de mediana estatura el cual le hizo entrega de algo. El auto viró y volvió y se estacionó en el negocio c/p Riveras Places, donde tocó bocina y salió un señor trigueño, alto con gorra de pelotero, el que conozco de vista y al yo pasarle por el lado, observé que le entregó dinero y una envoltura de papel de celofán y entonces continué y me ubiqué cerca de la residencia de nuevo y al cabo de varios minutos este auto llegó y entró a la marquesina del frente, de ahí se bajó dicho individuo llevando consigo en sus manos unos bolsos pequeños de papel extraza (sic).

Que luego a eso de las 5:30 P.M., llegó frente a esta residencia un individuo joven en un auto gris obscuro, tablilla 98U791 y entró en dicha residencia.

Que a eso de las 5:40 P.M., salió el señor mayor llevando en sus manos un bolso color blanco, el cual echó en el baúl del auto gris y abordó el vehículo y salió en dirección a la Carretera 14 y luego hacia Juana Díaz, donde al llegar al pueblo lo perdí de vista y yo regresé hacia el área de Ponce, a hacer otra investigación. Caso Núm. CE-88-623, Anejo I, págs. 1–2.

Se describe la propiedad objeto de vigilancia y se dan sus colindancias. Luego, continúa el relato de lo observado por él:

... [E]l día 1ro. de diciembre de 1987 en horas de la tarde, a eso de las 3:00 P.M., regresé [a] el área de investigación con el propósito de continuar investigando, que a eso de las 3:15 P.M. llegó un auto Toyota, tablilla 98U791 del cual se desmontó un joven y penetró en la residencia, a (sic) que a eso de las 4:00 P.M. salió de la residencia el señor de la vez anterior, abordó el vehículo grande azul, salió hacia la calle desde donde tocó bocina y oí cuando dijo, "Julito", ven acá, y del interior de la casa salió el joven del auto Toyota y hablaron algo. El joven regresó a la casa y el señor abandonó el lugar en dirección hacia el Bo. Ollas y yo le dí seguimiento a éste fue a los mismos negocios de la vez anterior.

Que yo seguí hacia el Bo. Descalabrado y al regresar hacia la

casa objeto de vigilancia observé que el auto azul estaba en la entrada de la residencia y frente a la misma había una máquina agrícola color azul y en la verja específicamente en el patio se encontraba el conductor del auto azul y en la parte de afuera un individuo trigueño bajito con gorra el cual tenía dinero en la mano y hablaban entre sí. Que abandoné este lugar en la completa seguridad de que la información recibida y por mí investigada es correcta, ya que la forma del conductor del auto azul actuar, es la forma típica y clásica en que operan las personas que están relacionadas con el juego ilegal de la bolita, por lo que no tengo duda de que a esta casa llega material del juego ilegal de la bolita, el cual es cotejado y cuadrado en la misma. Caso Núm. CE-88-623, Anejo I, pág. 2.

La orden de allanamiento fue debidamente diligenciada y se ocupó material relacionado con bancas clandestinas de bolita, la cantidad de $2,248.61 en cheques y la cantidad de $3,146 en efectivo.

El 7 de marzo de 1988, los recurridos presentaron un escrito titulado "Moción solicitando supresión de evidencia" alegando la inexistencia de causa probable para la expedición de la orden de allanamiento. El 25 de abril de 1988, el Tribunal Superior de Puerto Rico, Sala de Ponce, denegó la referida moción. Los recurridos presentaron a tiempo una moción de reconsideración, que fue declarada con lugar, y se ordenó la supresión de la evidencia.

En el segundo caso, el negocio del recurrido Oscar Colón Maldonado, localizado en la Calle Guillermo Esteves del Municipio de Jayuya, Puerto Rico, fue objeto de un allanamiento por parte de agentes del orden público.

La orden de allanamiento, que autorizó la intervención en el referido negocio, fue expedida el 16 de octubre de 1987 por el Tribunal de Distrito de Ponce, basada en la declaración jurada del agente Colón Rivera, adscrito a la División de Drogas y Narcóticos de Ponce. El agente manifestó en su declaración lo siguiente:

Que el día 14 de octubre de 1987, en horas de la tarde recibí unas instrucciones del Sgto. Zayas de que fuera al pueblo de Jayuya a investigar un negocio de nombre Colón's Mini Market

ubicado en la Calle Guillermo Esteves ya que en ese negocio están vendiendo drogas *porque él había recibido una querella de dicho negocio.* Que salí para dicho pueblo y localicé dicho negocio. Me estacioné frente a una oficina de la Autoridad de Energía Eléctrica que está ubicada al lado del negocio, que a la media hora de estar allí pude observar a un individuo trigueño que cruzó la calle y saludó a un individuo que estaba atendiendo el negocio Colón's Mini Market, el individuo cruzó la calle le entregó unos billetes al individuo que estaba atendiendo el negocio Colón's Mini Market, este fue hasta la caja registradora y la abrió y sacó una envoltura de aluminio y se la entregó al individuo que había cruzado la calle. Este individuo la revisó y se retiró del lugar perdiéndolo de vista. La transacción ocurrió a las 2:30 P.M.

Hago constar que lo que presencié por mi experiencia se que se trataba de una transacción de droga. Que el individuo que atendía el negocio se describe de la siguiente manera: 5'4" de estatura [a]proximadamente, 150 a 165 libras aprox., tez trigueño claro, pelo negro ondulado, que me retiré del lugar, llegué a Ponce y rendí servicio a las 6:15 P.M. Que el día 15 de octubre de 1987 en horas de la mañana le dí conocimiento al Sgto. Zayas de lo que había investigado y éste me ordenó que prestara una declaración jurada ante un magistrado solicitando una orden de allanamiento. Que no intervine con estas personas ya que las instrucciones eran de observar y no intervenir. (Énfasis suplido.) Caso Núm. CE-88-756, Apéndice I, pág. 1.

La orden de allanamiento fue debidamente diligenciada y se ocuparon cantidades de marihuana y cocaína. Al recurrido también se le ocupó un revólver Colt, calibre 38, cargado con seis (6) balas que el agente vio cuando éste bajaba de su automóvil. En el auto se ocupó una manopla.

El 12 de febrero de 1988, el recurrido presentó una moción de supresión de evidencia al amparo de la Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Luego de varios incidentes procesales, el Tribunal Superior, Sala de Utuado, declaró con lugar la moción de supresión de evidencia mediante resolución dictada el 29 de noviembre de 1988.

En el tercer caso la residencia de los recurridos Eliodoro Ocasio Torres y Amilce Vélez Ramos, ubicada en la Calle Santiago Oppenheimer U–1 de la Urbanización Las Deli-

cias en Ponce, Puerto Rico, fue objeto de un allanamiento por parte de agentes del orden público. Aquí también se ocupó material relacionado con el juego ilegal de la bolita.

La orden de allanamiento fue expedida el 18 de noviembre de 1988 por el Tribunal de Distrito de Ponce, basada en una declaración jurada del agente Rosado Vega, adscrito a la Unidad de Control del Vicio del área de Ponce. En su declaración, el agente manifestó lo siguiente:

Que se me asignó a investigar confidencialmente *una información recibida por mí telefónicamente*, en la Unidad de Control Vicio de Ponce, en el sentido de que un sujeto apodado Kiko, el cual es propietario de un Club de Dominó, que ubica en el sector Cantera de Ponce, Puerto Rico y tiene un Pontiac, negro, tablilla AQL–022, éste todos los martes se dedica a recoger material de Bolita y dinero para luego cuadrarlo en su casa en las Delicias, *informó además este confidente el cual me ha dado información anteriormente*, que este señor c/p Kiko, tiene un arma de fuego, pero que no sabe si tiene o no licencia.

Que el día 1 de noviembre de 1988, comencé a investigar confidencialmente a eso de las 8:00 P.M., localicé el Club de Dominó, en el sector Cantera de Ponce, y frente a dicho Club llamado Los Angeles Coctail Lunch, el cual es en cemento, pintado de crema y gris, arriba tiene una casa que es parte del edificio, estaba estacionado un vehículo negro, marca Pontiac, con tablilla AQL–022, el cual tiene sobre el baúl un spoiler. Me estacioné en un auto oficial no rotulado, en un punto estratégico, donde podía observar los movimientos de dicho negocio; como a eso de las 8:30 P.M., pude observar un vehículo marca Sentra, azul; el cual era conducido por un sujeto, trigueño, se detuvo frente al negocio y tocó bocina y del interior del negocio salió un sujeto de un sombrero, blanco, bien vestido; después de una corta conversación el sujeto del auto Sentra le entregó un paquete; acto seguido el individuo de sombrero blanco, bien vestido, el cual concuerda con la descripción de la confidencia, procedió a abrir el baúl del auto Pontiac, antes mencionado. Luego se retiró al interior del negocio y el Sentra se retira del lugar.

Luego, como a eso de las 9:30 P.M., pude observar un sujeto, el cual reconocí; ya que se trataba del señor Vicente Rodríguez, el cual fue intervenido por mí en dicho sector por violación a la Ley 220, éste pasó frente al negocio varias veces, luego salió el individuo del sombrero, se saludaron y el señor Vicente Rodríguez, procedió a sacar algo del bolsillo derecho y lo entregó al señor del sombrero, procedió a examinar lo entregado. Luego, lo

introdujo en el baúl del auto antes mencionado, procediendo a penetrar al negocio. Procedí a desmontarme para pasar frente a dicho negocio para ver de cerca el movimiento de dicho negocio. Una vez frente al negocio y en esos instantes salió a la puerta el individuo del sombrero y pude notar que éste tiene una barba canosa, y es de unos 45 años aproximadamente.

Luego, regresé al auto y en esos momentos salía del negocio el señor del sombrero acompañado de otro individuo, blanco, de pelo negro, los cuales se montaron en el vehículo antes mencionado y se dirigieron en dirección hacia Tibes, luego doblaron hacia Jaime L. Driew (sic) y siguieron hacia el Madrigal; hasta conectarse con la carretera #10, doblando hacia Las Delicias y luego, entraron a la Calle Santiago Oppeinheimer, doblando a mano derecha y se estacionaron frente a la última residencia de la línea de casas del lado izquierdo, luego procedieron ambos a bajarse del vehículo y el conductor del sombrero, abrió el baúl y cada uno sacó del interior un bolso tipo "shopping bag", procediendo a entrar a la casa antes mencionada que se describe de la siguiente manera: casa pintada de blanco, de doble planta, con marquesina en aluminio, pintada de rojo y blanco, a mano izquierda tiene una puerta en madera con vidrieras en colores; que simulan un "Cisne" al final de dicha marquesina, hay una palma en el patio, frente a la casa a mano izquierda, colinda con una casa de cemento, de una planta, pintada de color mostaza, con el número U–2, a mano derecha pasa la calle Oppenheimer, que a su vez colinda con terrenos de una Parroquia o Iglesia.

Continúo con la investigación ubicándome en un punto estratégico, dónde podía observar dicha residencia. A eso de las 12:30 P.M., salieron de la residencia, los dos individuos antes mencionados, los cuales montaron el vehículo antes mencionado; pude notar que no llevaban nada en las manos retirándose del lugar. Continúo en el sitio de vigilancia y a eso de la 1:00 P.M., regresó el vehículo en cuestión, el cual se estacionó frente a la residencia antes descrita, el del sombrero se desmontó llevando en las manos lo que parecía un bloque de papeles, el pasajero no llevaba nada, entraron a la casa y luego salió el pasajero y metió el auto dentro de la marquesina. Pude escuchar el llanto de un bebé que salía del interior de dicha residencia. Luego, me retiré del lugar a eso de la 1:30 A.M.

Continúo la investigación de éste caso pidiendo la relación de la tablilla AQL–022, la cual reflejó el nombre del señor Eliodoro Ocasio Torres y la Dirección, Delicias U–1, Ponce, la cual concuerda con la antes descrita. El día 16 de noviembre de 1988, a eso de la 1:00 A.M., me ubiqué en un punto estratégico para observar el movimiento en la residencia antes mencionada,

pude observar que el auto Pontiac negro, no se encontraba en la marquesina. A eso de la 1:30 A.M., llegó un auto Toyota, tipo guagua, con la tablilla 89C290, y casi detrás de éste, llego el Pontiac negro, el cual fue estacionado dentro de la marquesina. El sujeto de la guagua, se desmontó llevando en las manos un bloque de papeles parecido a la de la vez anterior, este sujeto se parecía al pasajero de la vigilancia anterior, el cual saludó al del sombrero blanco y ambos procedieron a entrar a la residencia. A eso de las 2:30 A.M., llegó al lugar un auto Toyota, color vino, el cual tocó bocina y del interior de la residencia salió el de la guagua antes mencionada, el cual aceptó una bolsa blanca y volvió a entrar a la residencia. El auto se marchó del lugar sin poderle coger la tablilla de dicho vehículo.

Me mantuve observando dicha residencia la cual era la única residencia en la línea de casas que mantenía las luces, interiores y exteriores encendidas. Me retiré del lugar a eso de las 3:00 A.M., convencido de que en dicha residencia se dedican a violar la Ley 220, Ley de Bolita y/o Boli-Pool. (Énfasis suplido.) Caso Núm. CE-89-780, *Exhibit* I de la Petición de *certiorari*, págs. 1–2.

La orden de allanamiento fue debidamente diligenciada y se ocupó material relacionado con el juego ilegal de la bolita y la cantidad de $235, 500.

El 3 de marzo de 1989, los recurridos radicaron una moción de supresión de evidencia. Luego de varios incidentes procesales, el Tribunal Superior de Puerto Rico, Sala de Ponce, ordenó la supresión de la evidencia ocupada mediante resolución dictada el 25 de septiembre de 1989.

Inconforme con las determinaciones en los casos anteriores relacionados, el Ministerio Público acudió ante este Tribunal mediante recursos separados de *certiorari* y alegó en cada uno de ellos los errores siguientes:

1. Incurrió en error manifiesto el Tribunal Superior al resolver que la orden de allanamiento expedida por el magistrado no estaba basada en causa probable ...
2. Incurrió en grave error el Tribunal Superior al decretar la supresión de evidencia, independientemente de lo relativo al señalamiento anterior, pues aún cuando se determina[ra] que un análisis o escrutinio riguroso de la declaración jurada que sirvió de base a la orden arrojara como resultado, en revisión judicial mediante el procedimiento de supresión (Regla 234),

insuficiencia para causa probable, la moción de supresión debió declararse sin lugar, bajo la doctrina de "buena fe" (good faith) establecida por el Tribunal Supremo de los Estados Unidos en el caso *United States* v. *León*, 468 U.S. 897 (1984). Caso Núm. CE-88-623, Petición de *certiorari*, pág. 3.

## II

La controversia que plantean estos casos consolidados es la suficiencia, bajo la Constitución federal, de las declaraciones juradas que sirvieron de base para expedir las respectivas órdenes de registro y allanamiento. Estas declaraciones tienen como denominador común que todas están fundadas *parcialmente* en confidencias hechas a los agentes por personas cuya identidad se desconoce. En estos casos la declaración jurada que se utilizó para la determinación de causa probable descansa en gran medida en la observación directa de los agentes del orden público. La confidencia, más que un elemento por sí solo en la determinación de causa probable, fue la razón que llevó al agente a hacer la observación. Debemos decidir si tales declaraciones juradas eran suficientes en derecho para sostener la determinación de causa probable que se requiere para una orden judicial de registro o allanamiento, a la luz de las exigencias de la Constitución federal.

## III

En Puerto Rico el requisito de causa probable para que se pueda expedir una orden judicial de registro o allanamiento es de naturaleza constitucional[1] y está ampliamente regulado.[2]

---

[1] Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1.

[2] Reglas 229–234 de Procedimiento Criminal de 1963 (34 L.P.R.A. Ap. II).

Aparte de la exigencia de que exista causa probable para que se pueda expedir una orden de allanamiento, el acusado que entienda haber sido sometido a un allanamiento ilegal puede solicitar, mediante moción previa al juicio, la supresión judi-

Las normas constitucionales o reglamentarias van dirigidas a proteger la intimidad de la persona.([3]) Para armonizar el derecho a la intimidad que tiene todo individuo, con el fundamental interés del Estado de poner en vigor las leyes penales, se le encomienda a la autoridad judicial determinar cuándo puede el Estado legítimamente intervenir con el ámbito de intimidad del individuo. La causa probable define el punto en que tal intervención es permisible. En *Pueblo v. Rivera*, 79 D.P.R. 742, 747 (1956), este Tribunal tuvo la oportunidad de definir el estándar para juzgar si existe causa probable. A estos efectos, señaló:

El criterio o medida para juzgar si existe causa probable no puede expresarse en términos rígidos y absolutos: la cuestión estriba en determinar si los hechos y las inferencias que se derivan de los mismos, a juicio de una persona prudente y razonable, bastan para creer que se está cometiendo o se ha cometido el delito por el cual la ley autoriza la expedición de una orden de allanamiento. *Carroll v. United States*, 267 U.S. 132

---

cial de cualquier evidencia obtenida en virtud de tal allanamiento.

Además, el acusado tiene varias ocasiones posteriores en el procedimiento criminal en las cuales puede cuestionar una orden de allanamiento que sea ilegal. Así, pues, (1) puede solicitar la revisión mediante *certiorari* de cualquier resolución judicial que deniega la supresión de evidencia que haya solicitado antes; (2) puede en apelación plantear otra vez como error el que el tribunal de instancia no haya suprimido la evidencia, y, claro está (3) en el propio acto del juicio puede insistir en la supresión de la evidencia obtenida ilegalmente. Este último remedio, reconocido en *Pueblo v. Hernández Flores*, 113 D.P.R. 511 (1982), se puede utilizar en aquellos casos en que de la prueba de cargo surja la ilegalidad del registro o en los que la defensa cuente con prueba adicional y lo fundamente.

([3]) La cláusula constitucional y las Reglas de Procedimiento Criminal antes señaladas van dirigidas a proteger la inviolabilidad de la persona. Los miembros de la Asamblea Constituyente estaban conscientes de que el hogar, los muebles, los utensilios, los libros y los papeles son una prolongación de la persona y que una intromisión en ese círculo equivale a una violación de la personalidad. Véase 4 Diario de Sesiones de la Convención Constituyente 2567 (1952).

En *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979), este Tribunal citó con aprobación a *Katz v. United States*, 389 U.S. 347 (1967), a los efectos de que la garantía constitucional contra registros y allanamientos irrazonables protege fundamentalmente a las personas y no lugares específicos. La cuestión central es si dentro de las circunstancias del caso específico, la persona tiene una expectativa razonable de que su intimidad se respete.

Los valores centrales que interesa proteger la garantía contra registros y allanamientos son la intimidad del ser humano y su dignidad innata.

(1925); *Steele v. United States*, 267 U.S. 498 (1925); *Dumbra v. United States*, 268 U.S. 435 (1925). *Meras sospechas no constituyen causa probable, pero tampoco es necesario que el juez quede convencido fuera de toda duda razonable de que se está violando la ley.* Como indicó el Tribunal Supremo de los Estados Unidos en *Brinegar v. United States*, 33 U.S. 160, 175 (1949): *"Cuando nos referimos a causa probable ... actuamos a base de probabilidades. Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho. La norma o regla en cuanto a la prueba, por consiguiente, depende de la cuestión que debe probarse.* (Énfasis suplido.) Veanse, además: *Pueblo v. Tribunal Superior*, 91 D.P.R. 19 (1964); *Pueblo v. Alcalá Fernández*, 109 D.P.R. 326 (1980).

La determinación de causa probable puede estar basada en los hechos percibidos por el declarante, por información recibida de un tercero o por una combinación de ambos. Véanse: *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982), y E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Cap. 6, págs. 361–362. Los casos consolidados ante nuestra consideración presentan la tercera modalidad. En los casos de declaraciones juradas basadas parcialmente en el testimonio de un informante anónimo, el magistrado debe ser sumamente cauteloso al expedir órdenes de registro que tomen en cuenta dicha información, ya que la persona que la provee no está disponible para que el magistrado la examine y pueda determinar si su testimonio merece credibilidad y es confiable.

Anteriormente, este Tribunal tuvo ante su consideración el problema específico de la suficiencia bajo las normas constitucionales federales de una declaración jurada parcialmente basada en información provista por un confidente que se utiliza para expedir una orden judicial de allanamiento.([4]) En esa ocasión no hubo opinión mayorita-

---

([4]) *Pueblo v. Martínez Martí*, 115 D.P.R. 832 (1984).

ria del Tribunal. Sí hubo gran discusión sobre las ventajas y desventajas de los dos escrutinios principales desarrollados por el Tribunal Supremo de Estados Unidos para lidiar con situaciones como las de autos, y sobre cuál debía adoptarse en Puerto Rico.(5)

 Estando pendiente ante nuestra consideración la solución de estos casos, resolvimos el de *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992), con la sola disidencia del Juez Asociado Señor Rebollo López. Allí, interpretando solamente nuestra propia constitución, hicimos extensiva la norma de *Pueblo v. Díaz Díaz*, supra, al ámbito de registros y allanamientos.(6) Nos pareció razonable hacerlo, aunque la norma de *Pueblo v. Díaz Díaz;* supra, se había elaborado en el contexto de arrestos sin orden según los "motivos fundados" en confidencias. Consideramos que si la norma era válida para el arresto, lo debía ser también para el registro o allanamiento, en vista de que no hay

---

(5) El escrutinio conocido como *Aguilar-Spinelli,* surgió de los casos *Aguilar v. Texas,* 378 U.S. 108 (1964), y *Spinelli v. United States,* 393 U.S. 410 (1969). Según este escrutinio, un magistrado puede expedir una orden de registro basada en el testimonio provisto por un confidente, si tiene información ante sí que le permita conocer la fuente del confidente y le permita evaluar la confiabilidad o credibilidad del confidente o de su relato. Ambos requisitos son de estricto cumplimiento bajo este método de análisis.

El escrutinio de *Gates* surgió del caso *Illinois v. Gates,* 462 U.S. 213 (1983). En este caso el Tribunal Supremo de Estados Unidos modificó la regla establecida en *Aguilar v. Texas,* supra, al señalar que los dos elementos de este binomio no tienen "*status* independiente" y que el escrutinio que se ha de utilizar sería el de la totalidad de las circunstancias. Según este método de análisis, el magistrado que va a expedir una orden de allanamiento sólo tiene que decidir de acuerdo con las circunstancias señaladas en la declaración jurada si hay una probabilidad razonable de encontrar evidencia del delito en particular. Véanse: *Pueblo v. Martínez Martí,* 115 D.P.R. 832 (1984); E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos,* Colombia, Ed. Forum, 1991, Vol. I, Cap. 6, págs. 362–369.

(6) En *Pueblo v. Díaz Díaz,* 106 D.P.R. 348, 354 (1977) —reafirmado en *Pueblo v. Acevedo Escobar,* 112 D.P.R. 770 (1982)— resolvimos que:

"[U]na confidencia es suficiente para validar la existencia de causa probable si se establece la concurrencia de una o más de las siguientes circunstancias: 1) que el confidente previamente ha suministrado información correcta; 2) que la confidencia conduce hacia el criminal en términos de lugar y tiempo; 3) que la confidencia ha sido corroborada por observaciones del agente, o por información proveniente de otras fuentes; y 4) que la corroboración se relaciona con actos delictivos cometidos, o en proceso de cometerse."

mayor intrusión con la intimidad de la persona que el arresto. La incautación de la persona misma constituye una intervención gubernamental con la intimidad del ser humano más grave que el registro o allanamiento de una pertenencia suya, y la norma que rige lo mayor debe ser buena también para una intervención menor. Chiesa, *op. cit.*, pág. 361.

Nos corresponde ahora decidir si tal determinación es cónsona con la jurisprudencia federal. Como hemos señalado reiteradamente, no estamos obligados a seguir al pie de la letra todas las decisiones del Tribunal Supremo de Estados Unidos sobre el particular. Sólo nos obligan aquellas decisiones que señalan el contenido mínimo requerido por la Constitución federal en el ámbito de registros y allanamientos de acuerdo con la Cuarta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, aplicable a los estados según la Decimocuarta Enmienda de dicha Ley Fundamental. Véanse: *Pueblo v. Dolce*, 105 D.P.R. 422 (1976); *Cooper v. California*, 386 U.S. 58 (1967). No obstante, nada hay que nos impida adoptar una interpretación que se ajuste a nuestra realidad jurídica y social, y al mismo tiempo cumpla con el estándar mínimo requerido por la Constitución federal.

El Ministerio Público nos insta a adoptar el escrutinio de *Illinois v. Gates*, 462 U.S. 213 (1983) —de la totalidad de las circunstancias— ya que, según su criterio, el esbozado en *Pueblo v. Díaz Díaz*, supra, puede, en algunas situaciones, no satisfacer el mínimo constitucional federal requerido para validar el uso parcial de una confidencia en la determinación de causa probable, como ocurriría si sólo se cumple con uno de los requisitos señalados en *Pueblo v. Díaz Díaz*, supra. En vista de este planteamiento, debemos aclarar que aunque en nuestras decisiones hemos dicho que basta uno solo de los requisitos señalados en *Pueblo v. Díaz Díaz*, supra, para que la información provista por un confidente anónimo sirva parcialmente de base para deter-

minar válidamente la existencia de causa probable, *lo cierto es que, al aplicar la norma, siempre hemos exigido que la confidencia haya sido corroborada por el agente, ya sea mediante observación personal o por información de otras fuentes.* En *Pueblo v. Díaz Díaz,* supra, pág. 355, señalamos:

> ... [P]uede establecerse causa probable mediante prueba de una confidencia que aunque en su origen sea incompleta, unida a información ulterior obtenida por los agentes, [*que*] *en algún sentido ... corrobore* que la persona arrestada estaba en el proceso de cometer un delito ....

En *Pueblo v. Acevedo Escobar,* supra, pág. 775, también se le dio gran importancia al hecho de la corroboración. En ese caso señalamos:

> Las observaciones personales de los agentes fueron corroborando el contenido mismo de la confidencia revelada que ciertamente versaba sobre hechos delictivos que estaban ocurriendo en aquel preciso momento, con potencial hacia un futuro inmediato.

Por último, en *Pueblo v. Pagán, Ortiz,* supra, también destacamos la importancia de la corroboración. *Pueblo v. Pagán, Ortiz,* supra, págs. 484–485. La norma de *Pueblo v. Díaz Díaz,* supra, *tal como la hemos aplicado,* cumple con el estándar fijado en *Illinois v. Gates,* supra. La corroboración es un mecanismo efectivo que permite evaluar las fuentes del conocimiento del confidente, su credibilidad y la confiabilidad de la información provista.([7]) Estos elementos, establecidos en el escrutinio de *Aguilar v. Texas,* 378 U.S. 108 (1964), no fueron abandonados por *Illinois v. Gates,* supra, ya que esa decisión sólo estableció que dichos elementos debían ser evaluados a la luz de la totalidad de

---

([7]) El uso de este mecanismo no excluye que se pueda determinar que la información provista por el confidente es confiable por otros medios. Por ejemplo, una confidencia puede contener suficientes detalles que describan la actividad criminal del acusado. Los detalles dan lugar a una inferencia de que el informante descansa en algo más que un rumor. Véase Chiesa, *op. cit.,* pág. 365.

las circunstancias de cada caso y no como moldes rígidos e independientes que derrotasen la existencia de causa probable ante la debilidad de uno de ellos.

 Por lo tanto, reiteramos que al evaluar la suficiencia de una declaración jurada parcialmente basada en confidencias, y que se tomó en cuenta en la expedición de una orden de registro o allanamiento, utilizaremos la norma establecida en *Pueblo v. Díaz Díaz*, supra, según la hemos interpretado de conformidad con el caso *Illinois v. Gates*, supra, aplicando también, claro está, *los criterios establecidos en Pueblo v. González del Valle, 102 D.P.R. 374 (1974); Pueblo v. Ayala Ruiz, 93 D.P.R. 704 (1966), y Pueblo v. Luciano Arroyo, 83 D.P.R. 573 (1961), respecto a testimonios estereotipados.*([8]) Rechazamos la norma de *Aguilar v. Texas*, supra, en la medida en que le da carácter independiente e inflexible a los elementos anteriormente discutidos. Debemos tener presente que al revisar la determinación del tribunal de instancia no nos toca hacer una determinación *de novo* de causa probable. Sólo nos corresponde estimar si la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable por el magistrado. Véanse: *Illinois v. Gates*, supra, Chiesa, *op. cit.*, pág. 371.

Debemos reiterar que nuestra referencia al caso *Illinois v. Gates*, supra, es sólo a los fines de indicar cuál es el requisito mínimo exigido por la Constitución federal que estamos obligados a seguir. Tal referencia no implica que adoptamos todos los pronunciamientos señalados en *Illinois v. Gates*, supra. Simplemente adaptamos el criterio establecido en *Pueblo v. Díaz Díaz*, supra, reiterado en *Pueblo v. Pagán, Ortiz*, supra, para conformarlo al mínimo

---

([8]) Al examinar cuidadosamente la declaración jurada, el magistrado debe cerciorarse que de la faz de la declaración surge información lo suficientemente detallada (cónsona con el esquema que adoptamos hoy) para determinar que no se trata de declaraciones estereotipadas e insuficientes del agente conforme a los criterios esbozados en los casos aludidos.

constitucional requerido que es el del caso *Illinois v. Gates*, supra.

## IV

La aplicación del esquema establecido en *Pueblo v. Díaz Díaz*, supra, según lo hemos interpretado a la luz de la Constitución federal en esta opinión, nos mueve a resolver que en los casos de *Pueblo v. Oscar Colón Maldonado*, CE-88-756; *Pueblo v. Eliodoro Ocasio Torres y Amilce Vélez Ramos*, CE-89-780, y *Pueblo v. Julio Muñoz Santiago y Carmen González Nazario*, CE-88-623, el tribunal de instancia erró al declarar con lugar la moción de supresión de evidencia.

En el caso del acusado Colón Maldonado, la confidencia fue corroborada por las observaciones del agente Colón Rivera. Lo que el agente mismo presenció, y que el tribunal de instancia calificó como mera transacción mercantil, no puede calificarse como tal. Allí se entregó el dinero primero y se sacó la mercancía —una envoltura de aluminio— de la caja registradora. El hecho de que la transacción haya ocurrido de día y en un negocio público no hace inverosímil el que se hubiese realizado una transacción ilegal de drogas. En *Pueblo v. Rivera Rodríguez*, 123 D.P.R. 467, 481 (1989), señalamos, en el contexto de una apelación por convicción por infracción al Art. 404 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404, que:

> El hecho de que las transacciones se hayan realizado a plena vista no hace el testimonio inherentemente irreal. Por el contrario, la criminalidad y el trasiego de drogas que sufre el país ha llegado a un nivel que los delincuentes no temen realizar transacciones en lugares donde pueden estar sujetos a ser vistos por terceras personas.

La corroboración no debe limitarse a ver si la conducta observada es inocente o incriminatoria, sino a eva-

luar el grado de sospecha que conllevan todos los actos de la persona. Véanse: *Illinois v. Gates*, supra, págs. 243–244 esc. 13; *Pueblo v. García Colón*, 122 D.P.R. 334, 353 (1988), opinión disidente del Juez Asociado Señor Negrón García.

La investigación policial no tiene que generar por sí misma evidencia suficiente para establecer causa probable. Es suficiente que indique la presencia de alguna actividad sospechosa del carácter sugerido en la confidencia que unido a ella y a otras alegaciones en la declaración jurada pueda razonablemente constituir causa probable. Véase M.A. Rebell, *The Undisclosed Informant and The Fourth Amendment: A Search for Meaningful Standards*, 81 Yale L.J. 703, 716–717 (1972).

No debemos pasar por alto que el agente que prestó la declaración estaba adscrito a la división de drogas y narcóticos. Debemos suponer que tenía la destreza para reconocer transacciones del tráfico de sustancias controladas que el ciudadano común no posee. Este Tribunal ha reconocido que la experiencia de un agente especializado del orden público puede ser tomada en cuenta al determinar causa probable. Véanse: *Pueblo v. Hoffman Pérez*, 100 D.P.R. 556, 564–565 (1972), y *Pueblo v. Acevedo Escobar*, supra, pág. 779. En este caso no sólo se cumplió con el requisito de corroboración, sino también con el requisito de que la confidencia condujese hacia el acusado en términos de lugar y tiempo. Los agentes ocuparon cantidades de marihuana y cocaína precisamente en el negocio identificado en la confidencia.

El tribunal a quo señaló que no había fundamentos para determinar la confiabilidad o credibilidad del informante y si éste tenía conocimiento personal de la información suministrada. Pero tal determinación no era concluyente, según el escrutinio que hemos adoptado para decidir si una confidencia puede ser utilizada en una determinación de causa probable. La de marras satisfizo el estándar que hemos adoptado y, por lo tanto, no puede sostenerse la deter-

minación del tribunal a quo de que la confidencia no era suficiente para ser utilizada en la determinación de causa probable. El tribunal a quo se apoyó en el escrutinio de *Aguilar v. Texas*, supra, que hemos rechazado por ser demasiado riguroso al darle carácter independiente a los elementos antes señalados.

■ Una vez establecido que la orden de registro en este caso no era insuficiente, y que hubo causa probable para su expedición es ineludible concluir que tampoco procedía la supresión del arma ocupada al acusado Colón Maldonado. Aquí es de aplicación la doctrina de evidencia ilegal a plena vista. En *Pueblo v. Dolce*, supra, pág. 436, fijamos los requisitos para su aplicación:

1) El artículo debe haberse descubierto por estar a plena vista y no en el curso o por razón de un registro.
2) El agente que observ[a] prueba debe haber tenido derecho previo a estar en la posición desde la cual podía verse tal prueba.
3) Debe descubrirse el objeto inadvertidamente.
4) La naturaleza delictiva del objeto debe surgir de la simple observación. (Citas omitidas.)

■ En este caso se cumplen los cuatro (4) requisitos. Surge de la declaración jurada del agente Burgos Collazo que el arma fue descubierta cuando observó que el acusado Colón se bajó del auto y vio en su pierna izquierda una baqueta con el arma de fuego. El agente tenía todo el derecho a estar en el lugar donde observó el arma, ya que estaba diligenciando la orden de allanamiento expedida judicialmente y que resolvimos era suficiente en derecho para tales fines. Descubrió el arma inadvertidamente cuando observó al acusado desmontarse de su auto. Por último, el objeto ocupado es un arma. En Puerto Rico el poseer un arma no es un derecho, sino un privilegio. La regla general es de restricción o control en materia de posesión y/o portación de armas de fuego, constituyendo la portación autorizada la excepción a dicha regla general. En

consecuencia, un agente del orden público tiene derecho a detener y cuestionar al ciudadano que así actúa, y ocupar el arma de fuego hasta que se le demuestre que estaba autorizado a poseerla. Véase *Pueblo v. Del Río*, 113 D.P.R. 684 (1982). Aquí el acusado indicó que no tenía licencia para portar el arma por lo que actúo correctamente el agente al arrestarlo.

Por otro lado, en el caso de los coacusados *Ocasio Torres y Vélez Ramos* es razonable concluir que la determinación de causa probable fue suficiente para la expedición de la orden de allanamiento. La confidencia recibida en este caso fue corroborada mediante la observación directa del agente Rosado, por medio de información de su conocimiento y por la información recibida de un confidente que había brindado información anteriormente. Además, la confidencia condujo hacia el acusado en términos de tiempo y lugar, ya que se ocupó material relacionado con el juego de bolita precisamente en la residencia identificada en la confidencia. El auto mencionado en la confidencia se identificó a través de la relación de la tablilla solicitada por el agente y que aparecía registrado a nombre del coacusado Ocasio Torres. Este auto fue el mismo en el que el agente Rosado Vega observó que se depositaron paquetes y del que se sacaron bolsas de compra (*shopping bags*) con el alegado material de bolita.

 La relación del acusado con un individuo que había sido detenido por el mismo agente Rosado, por violación a la Ley de la Bolita, Ley Núm. 220 de 15 de mayo de 1948 (33 L.P.R.A. secs. 1247–1257), le impartía a la confidencia mayor credibilidad y hacía más probable que la actividad sospechosa del acusado fuese la que se le imputa. Además, no podemos pasar por desapercibido que el juego de la bolita se juega generalmente tomando en cuenta las últimas cifras de los primeros premios de la Lotería de Puerto Rico. *Pueblo v. Adorno Medina*, 92 D.P.R. 554, 558 (1965). En *Pueblo v. González*, 86 D.P.R. 250, 251 (1962),

este Tribunal reconoció que la forma en que se realiza el juego de la bolita es una materia de la cual se puede tomar conocimiento judicial. Tomamos conocimiento de que la Lotería de Puerto Rico se celebra los miércoles de cada semana. Las actividades realizadas por el acusado y observadas por el agente Rosado se realizaron el 1ro de noviembre de 1988, que era martes, y el 16 de noviembre de 1988, que era miércoles, en la madrugada. Estos datos unidos a todos los otros son suficientes, tanto bajo el esquema de *Pueblo v. Díaz Díaz*, supra, como el *de Illinois v. Gates*; supra, para encontrar causa probable para expedir una orden de registro.

Por último, en el caso de *Pueblo v. Julio Muñoz Santiago y Carmen González Nazario*, supra, concluimos que no procedía la moción de supresión de evidencia, ya que según esquema adoptado conforme a la Constitución federal y la totalidad de las circunstancias, encontramos que la declaración jurada que sirvió de base para la determinación de causa probable fue suficiente.

En la confidencia se describía el modus operandi de un tal "Yuyo" con el manejo y cuadre de una banca de bolita. Este modus operandi consistía en recoger material de bolita en Santa Isabel y Juana Díaz los martes, y luego llevarlo a su residencia donde lo cotejaba y cuadraba en unión a su hijo Julito. Luego, no más tarde de las 7:00 P.M., lo entregaba a otro bolitero.

La observación que hizo el agente Ortiz del acusado indicó que su modo de actuar coincidía con lo señalado en la confidencia. El agente Ortiz observó al acusado un martes salir de la residencia indicada en la confidencia. Lo siguió y vio que entró y salió rápidamente de tres (3) negocios, uno de ellos conocido por Rivera's Place. En el último lugar un individuo (descrito en la declaración jurada) le entregó dinero y una envoltura de papel de celofán. Luego, el acusado regresó a la residencia objeto del allanamiento llevando en sus manos un bolso pequeño de papel de estraza.

Más tarde (5:40 P.M. aproximadamente) salió de esa residencia llevando en sus manos un bolso color blanco, lo depositó en el baúl y se fue rumbo a Juana Díaz, y llegó a ese pueblo. El segundo día de investigación —también era martes— el acusado volvió a salir de la residencia aludida anteriormente y desde la calle llamó a un joven de nombre Julito, nombre que coincidía con el señalado en la confidencia. Hablaron unos minutos y el acusado se fue. El acusado se dirigió a los mismos negocios del martes anterior y realizó las mismas operaciones.

De lo antes descrito podemos concluir que el relato del informante aparece corroborado por las observaciones del agente Ortiz en varios aspectos: (1) las operaciones de Yuyo ocurrían los martes en la tarde, día antes del sorteo de la lotería, con que se juega generalmente la bolita; (2) las operaciones ocurrían en los sectores indicados por el confidente; (3) en la residencia identificada en la confidencia, se observó al joven llamado Julito y en ella se ocupó material utilizado por el juego de la bolita. Por último, no podemos pasar por desapercibido la destreza del agente en reconocer la forma en que actúan las personas dedicadas al juego de la bolita. El agente Ortiz indicó en su declaración jurada que la forma de actuar del acusado es la forma típica y clásica en que operan las personas relacionadas con el juego de bolita. En la confidencia se había señalado, además, que el c/p Yuyo había sido intervenido anteriormente por infracción a la Ley de la Bolita.(⁹) Las

---

(⁹) El uso de arrestos y convicciones previas se ha permitido en la determinación de causa probable cuando la conducta delictiva tiene suficiente similaridad con la naturaleza o forma de ejecutar el delito como parà dar lugar a una inferencia razonable de que la persona acusada cometió ambos actos. Sin embargo, la mera alegación de que cierta persona tiene reputación criminal con respecto a un delito no es suficiente para que se tome en cuenta. W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, Sec. 3.2(d), págs. 581–584. La determinación de causa probable debe estar basada en hechos y no en meras conclusiones. Véanse: *Pueblo v. Alcalá Fernández*, supra; *Pueblo v. Tribunal Superior*, supra. En este caso, el dato de que Yuyo había sido intervenido anteriormente no fue corroborado por el agente Ortiz a pesar de ser una información a la cual tendría fácil acceso. La mejor práctica es corroborar aquella

determinaciones del tribunal a quo, en la medida en que exigen más rigurosidad en detalles en las observaciones del agente, no deben sostenerse por no ser cónsonas con el escrutinio adoptado. Después de todo, este Tribunal ha reconocido en *Pueblo v. Tribunal Superior*, supra, pág. 25, que:

"Al determinar que es causa probable no estamos llamados a establecer si la ofensa que se imputa fue verdaderamente cometida. Nos concierne sólo la cuestión de si el deponente tuvo base razonable, al momento de prestar su declaración jurada y haberse librado la orden de registro, para creer que se estaba violando la ley en el lugar a ser allanado; y si los hechos aparentes que se desprenden de la declaración jurada son de tal naturaleza que una persona prudente y razonable pudiera creer que se ha cometido la ofensa imputada, hay la causa probable que justifica la expedición de una orden."

Vista la totalidad de las circunstancias en este caso, hay suficientes elementos en la declaración jurada que nos permiten concluir que la declaración era suficiente para una determinación de causa probable. Debemos reiterar aquí, otra vez, lo que ya hemos señalado de que no estamos tratando con órdenes basadas únicamente en confidencias, sino fundamentadas en las observaciones de un agente. La confidencia provoca una investigación policial y lo que se vierte en la declaración jurada es mayormente el conocimiento derivado de la observación directa del agente que condujo la investigación. La orden descansa en gran medida en esa observación directa.

En vista de que hemos resuelto que no procedía la supresión de evidencia en los casos ante nuestra consideración, no entraremos a dilucidar si debe o no ser adoptada

information a la que se tenga fácil acceso. De esta forma se reduce el riesgo de error en que pueda incurrir el agente en obtener una orden de registro insuficiente. No debemos olvidar que el estándar de causa probable persigue acomodar los intereses en conflicto del derecho a la intimidad con el interés del Gobierno de poner en vigor las leyes penales.

No obstante, la omisión de corroborar el dato antes aludido no es suficiente por sí solo para concluir que no hay causa probable.

en nuestra jurisdicción la doctrina de buena fe establecida en *United States v. León*, 468 U.S. 897 (1984). La discusión de este planteamiento se pospondrá para la ocasión en que la situación fáctica del caso amerite su discusión.

Para concluir debemos señalar que al adoptar la norma que hoy anunciamos, y al resolver los casos concretos ante nos de la manera particular en que se ha dispuesto, hemos tenido muy en cuenta los importantes valores que están en juego. El derecho a la intimidad tiene la mayor jerarquía en nuestro ordenamiento jurídico y todos los que formamos parte del sistema de administrar justicia en el país tenemos el deber de hacer valer ese derecho íntegramente. También tenemos la grave obligación de velar. porque se cumplan cabalmente las leyes penales del país, de las cuales dependen la seguridad y la tranquilidad de nuestros conciudadanos. Ello es particularmente cierto en esta época aciaga que nos ha tocado vivir en la que la violencia, el vicio, las drogas, la criminalidad y el justificado desasosiego que éstas causan forma una parte muy desgraciada de nuestra convivencia colectiva. En ocasiones el cumplimiento de aquel deber y de esta obligación conllevan la angustiosa labor de sopesar difíciles aspectos de complejas circunstancias. Es entonces el momento para rebasar los preciosismos conceptuales en aras de lograr el juicio certero que rigurosamente plasma *todos* los valores pertinentes. Eso hemos pretendido hacer mediante esta opinión.

Por los fundamentos expuestos, *se revoca la resolución del Tribunal Superior, Sala de Utuado, del día 22 de agosto de 1988 y aclarada el día 29 de noviembre de 1988 en Pueblo v. Colón Maldonado, CE-88-756, y las resoluciones del Tribunal Superior, Sala de Ponce, de 25 de septiembre de 1989 en el caso Pueblo v. Ocasio Torres y Vélez Ramos, CE-89-780, y la de fecha 9 de agosto de 1988 en Pueblo v. Muñoz Santiago y González Nazario, CE-88-623.*

La Juez Asociada Señora Naveira de Rodón concurrió con el resultado sin opinión escrita. Los Jueces Asociados Señores Rebollo López y Hernández Denton disintieron mediante opinión escrita.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Hace aproximadamente seis (6) meses, al disentir de una Opinión emitida por este Tribunal que convalidó una orden de registro y allanamiento expedida a base de un testimonio claramente perjuro, expresamos, en *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992),[1] que:

> En ocasiones nos cuestionamos el porqué dedicamos tiempo de nuestro recargado calendario de trabajo para solitariamente disentir de decisiones de este Tribunal, refrendadas por una mayoría absoluta de los integrantes del mismo, en las cuales asumimos posiciones en ciertos casos que resultan ser antipáticas no sólo para la inmensa mayoría de nuestra ciudadanía sino que, inclusive, para nosotros mismos.
>
> La contestación a dicha interrogante resulta ser sorprendentemente sencilla: *el hacerlo es un deber y obligación ineludible del desempeño responsable del cargo que ocupamos*; ello *independientemente* de cualquier otra consideración referente a personas o hechos específicos envueltos en el caso en particular en ese momento ante nuestra consideración.
>
> La decisión mayoritaria emitida por el Tribunal en el presente caso —el cual, no hay duda, es uno sumamente antipático debido a que todo tiende a indicar que los aquí apelantes efectivamente estaban envueltos en el *repugnante y canceroso* tráfico ilegal de armas y narcóticos— es un vivo ejemplo de la inaceptable máxima o proposición de que "el fin justifica los medios", máxima que nunca puede servir de fundamento jurídico a una convicción criminal bajo el ordenamiento vigente en nuestro País.

---

[1] Véase Opinión disidente emitida por el Juez suscribiente en *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470, 490 (1992).

Hoy nos vemos obligados, nuevamente, a disentir. Existe, sin embargo, una gran diferencia entre la ocasión anterior y la presente. La decisión hoy emitida resulta ser, si es que ello es posible, aún más *equivocada, dañina y peligrosa* que la del caso de *Pueblo v. Pagán, Ortiz*, ante.

I

Como es sabido, la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 299, establece que:

> *No se violará el derecho del pueblo* a la protección de sus personas, casas, papeles y efectos *contra registros, incautaciones y allanamientos irrazonables*.
> No se interceptará la comunicación telefónica.
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, *y ello únicamente cuando exista causa probable* apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
> Evidencia obtenida en violación de esta sección *será inadmisible en los tribunales*. (Énfasis suplido.)

Dicho precepto constitucional —el cual protege no sólo la intimidad y dignidad de nuestros conciudadanos sino que la santidad de los hogares de éstos contra invasiones ilegales o irrazonables de parte de, inclusive, administraciones o funcionarios que aspiran a actuar en la forma más escrupulosa posible, *Pueblo v. Vargas Delgado*, 105 D.P.R. 335 (1976), *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979)— sufre hoy el más rudo y mortal golpe por parte de un Tribunal que confunde al País en general, y a la profesión legal en particular, mediante la emisión de decisiones inconsistentes, contradictorias y totalmente carentes de una filosofía judicial definida.

Un *examen minucioso y cuidadoso* de la Opinión mayoritaria emitida revela que, *conforme la norma hoy establecida*, una orden de registro y allanamiento será valida en

esta clase de situaciones, *aún cuando* la "confidencia" verse sobre hechos *no* necesariamente delictivos, *y, aún cuando* los hechos que observe el agente, en alegada corroboración de la confidencia, *no* sean suficientes por sí solos para establecer causa probable, *siempre y cuando* la "confidencia" conduzca al agente hacia el "acusado" en términos de lugar y tiempo y el registro realizado produzca frutos criminosos.

Atrás, *y olvidada*, ha quedado la reiterada y sabia norma a los efectos de que el mero hecho de que un registro y allanamiento rinda frutos criminosos *nunca puede ser utilizado* como fundamento para convalidar la ilegalidad del registro y allanamiento efectuado. *Pueblo v. Barrios*, 72 D.P.R. 171 (1951); *Pueblo v. González Rivera*, 100 D.P.R. 651 (1972); *Pueblo v. Castro Santiago*, 123 D.P.R. 894 (1989).

Pero, sobre todo e infinitamente más peligroso, *atrás* ha quedado la jurisprudencia de este Tribunal a los efectos de que aún cuando la "forma de la Sec. 10 del Art. II de la Constitución de Puerto Rico ... es análoga a la de la Enmienda Cuarta [de la Constitución federal], ... el contenido es distinto". *Pueblo v. Dolce*, 105 D.P.R. 422, 429 (1976); razón por la cual tenemos la facultad, y el deber, de interpretar de manera más abarcadora las disposiciones de la citada Sección 10 en protección de la intimidad, y santidad de los hogares, de nuestros conciudadanos. *Pueblo v. Lebrón*, ante.

La ironía de toda esta situación jurídica radica en el hecho de que el Tribunal, no obstante hacer constar en la Opinión emitida que su propósito es el establecimiento de una regla que cumpla con "las exigencias de la Constitución federal", termina estableciendo una norma que resulta, inclusive, violatoria de la jurisprudencia federal interpretativa de dicha Constitución. Somos de la opinión que las "circunstancias" que valida este Foro en el presente caso *no* son a las que se refería el Tribunal Supremo de los Estados Unidos cuando estableció el criterio de la "totali-

dad de las circunstancias" en la decisión que emitiera en el caso de *Illinois v. Gates*, 462 U.S. 213 (1983).

Existe una abismal diferencia entre ese criterio y el criterio de la "totalidad de la nada" que hoy establece este Tribunal. Conforme este "criterio", y como surge de la propia Opinión mayoritaria, bajo la norma hoy establecida, para validar la orden de allanamiento expedida basta la *mera* querella general sobre supuesta actividad delictiva o sospechosa y la "corroboración" de dicha "confidencia" por parte de la policía; corroboración que, conforme a la Opinión mayoritaria, "no tiene que generar por sí misma evidencia suficiente para establecer causa probable", (opinión mayoritaria, pág. 986) siempre que la "confidencia [conduzca hacia] el acusado en términos de tiempo y lugar [y que se ocupe] material" (opinión mayoritaria, pág. 988) delictivo.[2]

## II

Dicho de otra manera y en forma más cruda: la santidad y privacidad del hogar de nuestros conciudadanos podrá

---

[2] Ilustrativo de lo arriba expuesto resulta ser el caso del acusado recurrido Oscar Colón Maldonado. Como surge de la declaración jurada que sirvió de base a la expedición de la orden de registro y allanamiento, se recibió en el cuartel de la policía una querella general sobre supuesto trasiego de drogas en el negocio perteneciente a éste (Colón's Mini Market). Se le ordenó al agente que "investigara" dicha querella. La "investigación" realizada consistió en apostarse frente a dicho negocio y observar a una persona darle dinero a un empleado del mismo, recibiendo la persona a cambio una envoltura de aluminio.

Como podemos notar, la querella o confidencia recibida no contenía detalle de clase alguna; esto es, la misma consistía en una imputación general sobre alegado trasiego de drogas. De los hechos observados por el agente —cambio de manos de dinero y una envoltura de aluminio— necesariamente no se tiene que concluir o inferir que se trata de una transacción delictiva; esto es, podría tratarse de una transacción comercial completamente legítima. En otras palabras, las observaciones del agente no sólo no generaron, por sí mismas, evidencia para el establecimiento de causa probable sino que no constituyen corroboración de clase alguna por cuanto la confidencia era una de tipo general. Ello no obstante, el Tribunal resuelve que existía causa probable para la orden de registro y allanamiento, expresando que:

"En este caso no sólo se cumplió con el requisito de corroboración, sino también con el requisito de que la confidencia condujese hacia el acusado en términos de lugar y tiempo. Los agentes ocuparon cantidades de marihuana y cocaína precisamente en el negocio identificado en la confidencia." Opinión mayoritaria, pág. 989.

ser impunemente violada, de hoy en adelante, a base del "criterio de la especulación y/o de la totalidad de la nada". Ello, conforme hoy resuelve este Tribunal, cumple a cabalidad con el requisito de "causa probable" exigido por la antes citada Sección 10 del Artículo II de nuestra Constitución.

Este Tribunal tiene, no hay duda, facultad para *interpretar* nuestra Constitución. *Lo que no tenemos es poder para abolir la misma.* Es por ello que disentimos.

— O —

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton.

Por entender que no es apropiado evaluar, a la luz del criterio de la totalidad de las circunstancias, la suficiencia de una declaración jurada fundamentada parcialmente en confidencias para la expedición de una orden de allanamiento, disentimos. La determinación de causa probable en estos casos debe fundarse en unos criterios claros y precisos que guíen al magistrado o a la autoridad judicial concernida a establecer *la suficiencia* de los hechos contenidos en la declaración jurada. De esta manera, se le garantiza al ciudadano una protección más efectiva de su intimidad contra las actuaciones irrazonables de los agentes del orden público en la obtención de órdenes de allanamiento.

No podemos suscribir la visión que de nuestro ordenamiento constitucional propone en el día de hoy la mayoría de esta Curia. Debido a que la Constitución del Estado Libre Asociado de Puerto Rico es de "factura más ancha" que la de Estados Unidos, somos del criterio que al interpretar la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1,[1] debemos refrendar una norma más rigurosa que la que se adopta en *Illinois v.*

---

[1] La Sec. 10 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 299, dispone:

*Gates*, 462 U.S. 213 (1983).([2]) En ese sentido, ratificamos las expresiones del Juez Asociado Señor Irizarry Yunqué cuando adjudicamos una controversia análoga en *Pueblo v. Martínez Martí*, 115 D.P.R. 832, 842 (1984):

> A tono con la reconocida norma de que un Estado puede expandir, mas no contraer los derechos garantizados por la Constitución federal ... podemos adoptar, y este es el caso para haber adoptado, una norma más exigente que la recientemente enunciada en *Illinois v. Gates*, supra.

En *Pueblo v. Dolce*, 105 D.P.R. 422 (1976), ya habíamos dejado claro que este Tribunal tiene la facultad para extender garantía contra registros y allanamientos ilegales más allá de los límites de la Enmienda Cuarta de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. Allí dispusimos que:

> La forma de la sec. 10 del Art. II de la Constitución de Puerto Rico ... es análoga a la de la Enmienda Cuarta, pero el contenido es distinto. Ambas disposiciones respondieron a circunstancias diferentes y es natural que su interpretación se atenga, dentro del marco de nuestras relaciones con Estados Unidos, a las realidades cambiantes de una y otra sociedad. *Pueblo v. Dolce*, supra, pág. 428.

Es nuestra obligación, pues, como máximos intérpretes de la Constitución del Estado Libre Asociado de Puerto Rico garantizar su vigorosidad teniendo presente la pre-

---

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables ....

*"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a.registrarse, y las personas a detenerse o las cosas a ocuparse.*

"Evidencia obtenida en violación de esta sección será inadmisible en los tribunales." (Énfasis suplido.)

([2]) Véanse, a modo de referencia: el voto concurrente del Hon. Juez White, *Illinois v. Gates*, 462 U.S. 213, 252 (1983), y el rechazo a la norma de la totalidad de las circunstancias en varios estados: *State v. Jones*, 706 P.2d 317 (1985); *People v. Griminger*, 524 N.E.2d 409 (1988); *State v. Jacumin*, 778 S.W.2d 430 (1989); *State v. Coleman*, 791 P.2d 504 (1989); *State v. Ibarra*, 812 P.2d 114 (1991); *State v. Cordova*, 784 P.2d 30 (1989).

eminencia de los derechos fundamentales y la dignidad de todos los seres humanos. Si bien debemos estudiar la experiencia en Estados Unidos, no debemos adoptar con automatismo judicial los cambios doctrinales del Tribunal Supremo federal que interpretan restrictivamente la protección contra los registros e incautaciones irrazonables.([3])

En *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984), sostuvimos que la garantía constitucional contra registros o incautaciones irrazonables persigue tres (3) objetivos, a saber: "[p]roteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias e interponer la figura de un juez entre los funcionarios públicos y la ciudadanía para ofrecer mayor garantía de razonabilidad a la intrusión ...".([4])

Precisamente, una de las críticas al análisis de la totalidad de las circunstancias, adoptado en *Illinois v. Gates.*, supra, consiste en que el uso del sentido común para determinar la suficiencia de una declaración jurada fundamentada parcialmente en información suplida por terceros *que no están presentes bajo juramento ante el juez o magistrado que expide la orden*, constituye una delegación de la función constitucional de que sean los jueces quienes, exclusivamente, determinen causa probable y no el policía quien presenta hechos que no le constan de propio conocimiento. Véanse: W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Pu-

---

([3]) Véase F. Hernández Denton y E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos,* 61 Rev. Jur. U.P.R. 531, 538 (1992).

([4]) En cuanto a los límites mínimos requeridos por la Constitución federal *vis-à-vis* el concepto de factura más ancha de nuestra Constitución, véanse, además: *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975), y su progenie, a saber: *Pueblo v. Figueroa Navarro*, 104 D.P.R. 721, 724 (1976); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 258 (1978); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 338 (1983); *Molina v. C.R.U.V.*, 114 D.P.R. 295, 308 (1983), opinión concurrente; *Pueblo v. Torres Albertorio*, 115 D.P.R. 128, 134 (1984); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 60 (1986); *Pueblo v. Rodríguez Rodríguez*, 128 D.P.R. 438 (1991), opinión disidente.

blishing Co., 1987, Vol. 1, Sec 3.3(a), págs. 620–627; *Pueblo v. Martínez Martí*, supra, págs. 839–841.

Al amparo de esta normativa, entendemos que el requisito constitucional de causa probable exige que las solicitudes para la autorización de registros no se conviertan en "peticiones a los magistrados para que efectúen, sin base suficiente, actos de fe. Tales solicitudes tienen que fundarse en hechos concretos, particularizados, que le permitan al juez desempeñar adecuadamente su delicada función". *E.L.A. v. Coca Cola Bott. Co.*, supra, pág. 217.

En la medida en que *la suficiencia de los hechos* revelados por un tercero y el fundamento de conocimiento de éste no puedan determinarse por la falta de unas pautas claras que ayuden al juez a cumplir cabalmente con su misión constitucional, de nada nos sirve recurrir a otros medios tendientes a establecer *la veracidad* de dichos hechos. Véase E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Cap. 6, págs 361–362.

Además, somos del criterio que en los tres (3) casos de autos, las declaraciones juradas que dieron fundamento a la expedición de las respectivas órdenes de allanamiento fueron insuficientes tanto bajo los casos de *Aguilar v. Texas*, 378 U.S. 108 (1964), y *Spinelli v. United States*, 393 U.S. 410 (1969), como a la luz del referido análisis en *Illinois v. Gates*, supra. Véase, a modo de comparación, *Pueblo v. Martínez Martí*, supra, pág. 860, voto concurrente del Juez Asociado Señor Rebollo López.

Al invocar como fundamento para su posición el hecho de que en el allanamiento se ocupó material delictivo, la mayoría revoca implícitamente toda nuestra jurisprudencia anterior sobre este asunto y deja sin efecto la cláusula constitucional que garantiza "el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables". Sec. 10 del Art. II de la Constitución del Estado Libre Aso-

ciado, *supra.* Como acertadamente afirma el Juez Asociado Señor Rebollo López en su disenso "[a]trás, *y olvidada,* ha quedado la reiterada y sabia norma a los efectos de que el mero hecho de que un registro y allanamiento rinda frutos criminosos *nunca puede ser utilizado* como fundamento para convalidar la ilegalidad del registro y allanamiento efectuado". (Énfasis en el original.) Opinión disidente, pág. 995.

La finalidad de combatir la criminalidad no debe poner en peligro los derechos humanos y los valores que inspiraron nuestro ordenamiento constitucional.[5]

Es el deber de esta Corte elaborar soluciones jurídicas creativas que al mismo tiempo que amplíen las garantías de nuestra Carta de Derechos, mantengan un equilibrio dinámico entre tanto los intereses de la comunidad como los individuales.

Al darle forma a la Sec. 10, Art. II de nuestra Carta de Derechos, Const. E.L.A., *supra*, la Convención Constituyente expresó claramente que "[e]n [la] colisión de lo privado y lo público, la solución se entrega, con todas las garantías, a la autoridad judicial encargada de perseguir y sancionar las transgresiones de la ley". 4 Diario de Sesiones de la Convención Constituyente 2567 (1952). "No fue exclusivamente una figura judicial la que inspiró la disposición constitucional sino el escrutinio imparcial de la evidencia de causa probable por un magistrado superpartes." O.E. Resumil de Sanfilipo, *Práctica jurídica de Puerto Rico: derecho procesal penal*, New Hampshire, Ed. Equity, 1990, T. I, Cap. 11, pág. 283.

El fin último de la incorporación de la Sec. 10 del Art. II a nuestra Constitución, *supra*, fue lograr más pureza y garantías en los procedimientos criminales. Diario de Sesiones, *supra*, pág. 2568. Por lo tanto, la calificación que le da la opinión mayoritaria de "preciosismos conceptuales" a los

---

[5] Hernández Denton y Chiesa Aponte, *supra.*

argumentos a favor de fortalecer las garantías fundamentales consagradas de manera expresa por nuestra Constitución, menosprecia y le resta vitalidad y vigencia a nuestra Carta de Derechos.

Conforme a lo anteriormente expuesto, confirmaríamos las tres (3) sentencias del Tribunal Superior, que declararon con lugar las mociones de supresión de evidencia.